G2, INC., Plaintiffs

v.

MIDWEST GAMING, INC., Defendant.

No. MO–06–CV–131.

United States District Court, W.D. Texas, Midland–Odessa Division.

April 17, 2007.

759

Andrew Harper Estes, Steven C. Kiser, Lynch, Chappell & Alsup, PC, Midland, TX, Michael Ashworth, William S. Leach, Eldridge, Cooper, Steichen & Leach, PLLC, Tulsa, OK, for Plaintiffs.

Frank Scarborough, Abilene, TX, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

PLATT, United States Magistrate Judge.

On February 22, 2007, the above-entitled cause of action was tried before this Court. After considering the weight and credibility of all the evidence and the respective arguments of the parties, the Court makes the following findings in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.[1]

### Initial Findings and Factual Background

Plaintiff G2 is a Sac and Fox nation corporation with its principal place of business in Tulsa, Oklahoma. In conjunction with the Veterans of Foreign Wars of the United States (VFW), Plaintiff operates sweepstakes gaming software at various locations in Texas that have, as the beneficiary, various entities and operations of the VFW.

The VFW is a nonprofit organization formed pursuant to 26 U.S.C. § 501(c) and founded in 1899. Its mission—to support programs to increase awareness of the sacrifices of American Veterans—is accomplished by establishing and maintaining programs to promote citizenship education, volunteerism, positive youth programs, and facilitation of medical, rehabilitative, educational, and employment services for Veterans and their families. To fund its mission and programs, the VFW relies on charitable fund-raising.

The VFW is comprised of posts located in all fifty states. One of the five largest posts is headquartered in Odessa, Texas (VFW–Odessa). The VFW post in Odessa is also a § 501(c) nonprofit organization.

One of the VFW's most successful and innovative fund-raising methods is charitable sweepstakes, which are visually unique from other sweepstakes methodology. Specifically, rather than utilizing a drawing, pull-tab, scratch-off tab, or information contained on the inside of a bottle cap to reveal winners, the VFW–Odessa sweepstakes utilizes a computer to draw game pieces and a computer screen to reveal with audio and video images whether the entrant is a winner. This approach provides additional entertainment value to an entrant. The sweepstakes hardware and software system and sweepstakes methodology employed by VFW–Odessa is

---

1. The Court will note (and further discuss in the text of these findings) that this case is not your classic litigation with two opposing parties advocating against each other. The parties are before the Court as opponents primarily because Plaintiff seeks a forum to sanction its sweepstakes activity as lawful in a very ambiguous environment.

already known to the Texas Alcoholic Beverage Commission (TABC).[2]

To participate in the sweepstakes, the rules provide for various methods the participant may employ to obtain sweepstakes entries:

- by purchasing merchandise through the Point-of Sale (POS) terminal;
- by making a donation to the organization through the POS terminal;
- by requesting sweepstakes entries at the POS terminal;
- by requesting entries by mail to be recorded on the POS terminal when the requestor brings them to the sponsor's location.

Accompanying each item of merchandise purchased or for each one dollar donation, one hundred sweepstakes entries are granted to the participant. If the participant requested sweepstakes entries with no purchase or donation at the location, the participant would be granted one hundred sweepstakes entries per day. The participant may also obtain one hundred sweepstakes entries without a purchase or donation by following the request-by-mail rules.

Upon completion of the transaction at the POS—either purchase, donation, or request without purchase or donation—the participant will be presented with a receipt containing a five-digit PIN. To access the sweepstakes entries, or the purchased internet time, the participant is required to enter the five-digit PIN at the Participant Access Terminal. Upon correct entry of the PIN, the video screen will display the number of sweepstakes entries available, any accumulated prizes, and any remaining internet time.

At the Participant Access Terminal, the participant may choose to play the sweep-

stakes game, browse the internet, or redeem accumulated prizes to make a donation to the organization and obtain more sweepstakes entries. Revealing the sweepstakes entries does not diminish any purchased internet time; all purchased internet time remains intact until used by the participant.

To reveal the sweepstakes entry results, the participant selects the desired game theme from the menu of sweepstakes game themes. Each game theme utilizes a unique pool of finite outcomes to reveal to the participant. Many game themes afford the participant an opportunity to reveal multiple sweepstakes entries simultaneously by allowing the participant to increase the level of play. In the instance when a participant elects to reveal multiple sweepstakes entries simultaneously, the odds of winning a prize for the selected game theme remain the same.

All sweepstakes prizes won are displayed as "WIN" on the Participant Access Terminal, and cannot be used to continue on to the game play. Participants may elect to redeem any sweepstakes prizes by making a donation to the organization at the Participant Access Terminal, for which they will receive additional sweepstakes entries; or exit the sweepstakes and redeem any prizes for cash at the POS by presenting the receipt issued at the beginning of the transaction that possesses the PIN and ticket ID number.

Defendant Midwest Gaming, Inc. is a Texas Corporation that has its principal place of business in Abilene, Texas. Midwest operated amusement redemption games within the Midland/Odessa Division of the Western District of Texas, beginning in 2000. "Amusement redemption

---

**2.** The TABC issued a letter to the VFW giving its implied approval for this sweepstakes, although there is some question as to the value of such an opinion, beyond an implied commitment by TABC not to attempt to enforce prohibitions against the sweepstakes.

games" are defined, pursuant to Texas Penal Code § 47.01(4)(b) as any electronic, electrotechnical, or mechanical contrivance designed, made, and adapted solely for *bona fide* amusement purposes if the contrivance rewards the player exclusively with noncash merchandise, prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than ten times the amount charged to play the game or device once or five dollars, whichever is less.

Midwest operated amusement redemption games in Odessa as a sweepstakes for approximately six weeks in July, August, and September 2006. Midwest ceased operations as a sweepstakes in Odessa at the request of local law enforcement and returned to operation as an amusement redemption game for replays only. Due to confusion regarding the differences between Midwest games and the VFW's sweepstakes, local law enforcement also requested that the VFW–Odessa voluntarily cease its operations. VFW–Odessa complied with this request.

### Procedural Background

On October 16, 2006, G2 initiated suit against Midwest[3] alleging unfair competition, unjust enrichment, fraud, negligent misrepresentation, and civil conspiracy, and sought money damages, an accounting, injunctive relief, and declaratory relief. Pursuant to Federal Rule of Civil Procedure 16 and Local Rule CV–16, and in an effort to resolve and simplify the issues before the Court, Midwest has agreed not to operate its machines as a sweepstakes,

and currently states it has no intention of operating these machines as a sweepstakes while this case is pending. In return, G2 and VFW–Odessa do not seek monetary damages from Midwest at this time. Further, Midwest's cessation of operations as a sweepstakes moots G2's request for injunctive relief. The only remaining issue is G2's request for declaratory judgment regarding the legality of the VFW–Odessa sweepstakes.[4]

### Stipulations

The parties have entered into the following stipulations. The Court is not required to accept the stipulations as fact. The Court will note any stipulations it finds objectionable.

1. This Court has jurisdiction over the parties **and subject matter of the instant action.**[5]

2. Venue of this action is proper in the United States District Court for the Western District of Texas—Midland/Odessa Division.

3. G2 is a corporation formed under the laws of the Sac and Fox Nation, which has its place of business in Tulsa, Oklahoma.

4. Midwest Gaming, Inc. operated amusement redemption games within the Midland/Odessa Division of the Western District of Texas, beginning in 2000. "Amusement Redemption" games are defined, pursuant to Texas Penal Code 47.01(4)(b), as any electronic, electromechanical, or mechanical contrivance designed, made, and adapted solely for *bona fi de* amusement purposes if the contrivance re-

---

3. The original Defendant, Brian Huntley, was believed at the time to be the operator of the amusement redemption games. The docket was corrected on February 20, 2007.

4. In essence, this case is the Plaintiff G2 pitted against the State of Texas, who is not a

party, with G2 seeking a federal court declaration that the sweepstakes is a legal operation.

5. The Court does not agree with the parties stipulation that the Court has subject matter jurisdiction.

wards the player exclusively with non-cash merchandise, prizes, toys or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or five dollars, whichever is less.

6. In Odessa, Texas, Midwest Gaming, Inc. operated amusement redemption games as a sweepstakes for approximately six weeks in 2006, from mid-July 2006 to the first week in September 2006. Midwest ceased operations as a sweepstakes in Odessa at the request of local law enforcement officials and returned to operations as an amusement redemption game for re-plays only.

7. The Veterans of Foreign Wars of the United States (VFW) is an organization formed pursuant to 26 U.S.C.A. § 501(c)(19) and is a nonprofit organization. Its mission is to support programs designed to increase awareness of the sacrifices of American Veterans. It accomplishes this mission by establishing and maintaining programs to promote citizenship education, volunteerism, positive youth programs, and facilitation of medical, rehabilitative, educational an employment services for Veterans and their families.

8. The VFW is comprised of a group of posts located in each of fifty states. One of the five largest posts of the VFW is headquartered in Odessa, Texas (VFW–Odessa). The VFW post located in Odessa is also an organization formed pursuant to 26 U.S.C.A. § 501(c)(19) and is a non-profit organization.

9. To fund its mission and programs, the VFW relies on charitable fund-raising. One of the VFW's most successful and innovative fund-raising methods is charitable sweepstakes, which are visually unique from other sweepstakes methodology.

10. The sweepstakes software and hardware supplied by G2 and under contract to the VFW differs operationally from amusement redemption games or lotteries.

11. The G2 system and central server distributes batches of sweepstakes game pieces, via the internet, to a local server. The entrant's computer requests that individual game pieces be revealed and the server sends the results to the entrant's computer. These results are revealed electronically. The G2 software draws from a finite set of game pieces with a predetermined, finite number of prizes. It then utilizes audio and visual images rather than text to reveal whether the entry is a winner or non-winner and the amount of any prize awarded. ***This process is part of what makes this system unique and compliant with law.***[6]

12. In 2006, after meeting with local law enforcement as part of due diligence and to insure regulatory and legal compliance, the VFW–Odessa and G2 entered into an agreement whereby G2 would create, implement and oversee sweepstakes for VFW–Odessa. G2 also provided free on-site video-conferencing allowing local families to interact with loved ones stationed overseas with the United States Military, inclusive of personnel posted in Afghanistan and Iraq.

**6.** The Court does not agree with the under-lined/bold sentence as a matter of law or as factually accurate.

13. The VFW–Odessa sweepstakes rules specifically provide, and the VFW–Odessa sweepstakes was operated to provide:

 a. an alternative means of entry or participation without a purchase or donation so that payment of money or purchase of an item is not necessary to participate or win;

 b. a provision that making a donation does not increase the participant's chance of winning a prize;

 c. assurances that a participant's odds of winning are identical no matter the method of entry selected;

 d. a clear statement as to the charitable beneficiary;

 e. a clear statement as to the exact nature and number of the prizes to be awarded; and

 f. the odds associated with winning each prize.

14. The software and hardware supplied by G2 under contract to the VFW–Odessa for its charitable sweepstakes is based on the same platform approved for use by the TABC as a sweepstakes.

15. At no time has the VFW–Odessa sweepstakes offered a grand prize for an amount equal to or exceeding fifty thousand dollars ($50,000.00).

16. Nick Farley, President of Nick Farley & Associates, is a nationally recognized expert with the requisite qualifications to offer opinion regarding the following subjects:

 a. the requirements for a *legal*[7] sweepstakes differs from amusement redemption games;

 b. how a sweepstakes differs from amusement redemption games;

 c. the mechanics of the VFW–Odessa sweepstakes.

17. In September 2006, despite initially having no objections to the VFW–Odessa sweepstakes, local law enforcement contacted G2 and VFW–Odessa and requested that all operations cease until confusion over the requirements for a sweepstakes could be determined.

18. On November 29, 2006, local law enforcement advised G2 and VFW–Odessa, through counsel, that an adjudication regarding the issues of this case was necessary to resolve confusion within the law enforcement community regarding the legality of the sweepstakes.

## *Discussion*

### I. Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction

■ Still pending before the Court is Defendant's summary judgment motion, which he has coined as a jurisdictional issue. While the Court agrees that a jurisdictional issue exists, the motion to dismiss is actually based on the doctrine of abstention. Because jurisdiction must be addressed before the Court can decide whether to abstain from extending such, the Court will proceed accordingly.

### A. Justiciability: Standing to Sue, and the Existence of an Actual Controversy

Before the Court addresses whether to extend jurisdiction, it must first determine whether an actual controversy exists. Per both parties, no issues remain except the legality of Plaintiff G2's sweepstake's machines. The first question, then, is whether Defendant wishes to contest that legali-

7. The Court does not agree with the underlined/bold word as a matter of law or as factually accurate.

ty. If he does not, then there is no actual case or controversy for the Court to determine in this matter, and the court cannot enter a declaratory judgment.

### 1. Adverseness requirement for ripeness

Federal courts may not issue declaratory judgment unless their exists an "actual controversy;" there must be substantial controversy of sufficient immediacy and reality between parties having adverse legal interests. *Middle South Energy, Inc. v. City of New Orleans,* 800 F.2d 488, 489 (5th Cir.1986). "This requirement is a cautionary one, designed to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect agencies from judicial interference until an administrative decision has been formalized."

While a controversy may have existed at the commencement of this action, any disagreements between the parties—per both Plaintiff and Defendant—have been resolved amicably. Only one of Plaintiff's prayers remains: that the Court declare its computer sweepstakes machines legal in order that it may continue to utilize them for fund-raising, which has apparently proven successful to Plaintiff.

G2 has no contractual relationship with the Defendant Midwest Gaming. Tortious interference with contractual relations between G2 and the VFW is not alleged, nor is it supported by the evidence. In fact, there is a serious issue of concern for this Court as to how G2 has standing to bring the lawsuit, which certainly affects the concept of "actual controversy" between the parties. Standing exists where a Plaintiff can demonstrate (1) an injury in fact, (2) causation, and (3) redressability. *Steel Co. v. Citizens for a Better Env't,* 523 U.S. 83, 102, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998); *Lujan v. Defenders of Wildlife,*

504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992); *Rivera v. Wyeth–Ayerst Labs.,* 283 F.3d 315, 318 (5th Cir. 2002); *see also* MICHAEL C. SMITH, O'CONNOR'S FEDERAL RULES: CIVIL TRIALS 2007 63 (2007). Plaintiff has not shown that Defendant Midwest Gaming caused it injury, nor that the requested declaratory relief would redress such injury if it had occurred.

### 2. There must be a real risk of future harm

A plaintiff must allege facts from which it appears there is a substantial likelihood that he will suffer injury in the future. There must be a substantial and continuing controversy between two adverse parties. *Graham v. Hill,* 444 F.Supp. 584, 588 (W.D.Tex.1978)(recognizing that the "case or controversy" requirement for standing is no less strict in a declaratory judgment proceeding than in any suit where other relief is sought). The continuation of the dispute must be reasonably inferable from the facts alleged. Additionally, the continuing controversy may not be conjectural, hypothetical, or contingent; it must be real and immediate, and create a definite, rather than speculative threat of future injury. Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief ... if unaccompanied by any continuing, present adverse effects." *Bauer v. Texas,* 341 F.3d 352, 358 (5th Cir.2003)(citing *City of Los Angeles v. Lyons,* 461 U.S. 95, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983)). It is enough for Plaintiff to demonstrate fear of future action from the Defendant through Defendant's past conduct. *State of Texas v. West Publishing Co.,* 882 F.2d 171, 176 (5th Cir.1989). However, a plaintiff must present "more than just allegations of a 'subjective chill,' and must present a claim of specific present objective harm or a threat of specific future harm from the

prohibitions of the statute under attack." *Graham,* 444 F.Supp. at 589.

Here, Defendant has already halted operations of its allegedly illegal gambling machines. In addition and per Plaintiff, whatever conflicts and allegations of financial damages suffered by Plaintiff have been resolved. Plaintiff offers no proof or assertions that Defendant poses a threat of continuing harm to Plaintiff or the VFW. Defendant is not the proper state agency from which a threat of prosecution under Texas gaming laws would originate; Defendant is not a state agency at all. In order for Plaintiff to properly secure the relief it seeks from a federal court, it would have to file suit against the proper party—likely the Texas Attorney General, the TABC, or a local law enforcement agency or prosecutor threatening sanctions. To the contrary, Plaintiff believes the TABC has approved the sweepstakes. Since Plaintiff has not filed suit against a state or local law enforcement/prosecutorial agency, no case or controversy exists, and Plaintiff's claim lacks justiciability. This Court, therefore, lacks jurisdiction to issue the requested declaratory relief.

**B. Diversity**

Although the Court is convinced that it lacks the requisite jurisdiction to take further action in this matter, the undersigned will issue its findings of fact and conclusions of law in the interest of judicial expediency given that a trial was conducted in this matter on February 22, 2007. Perhaps these findings will provide some guidance to the relevant enforcement agencies until a court of proper jurisdiction can enter a more binding opinion.

Assuming that an actual case or controversy did exist in this case, the court would have jurisdiction based on diversity. Plaintiff asserts that it is incorporated under the laws of the Sac and Fox Nation, with principal place of business in Oklahoma. Defendant does not contest Plaintiff's citizenship, and research indicates that diversity does exist. *Pope v. MCI Telecomms. Corp.,* 937 F.2d 258, 262 (5th Cir.1991).

Also, even though Plaintiff has dropped all but the request for declaratory judgment, "amount in controversy" is satisfied because in actions seeking declaratory relief, the value of the controversy is measured by the value of the object of the litigation to the plaintiff. *Hunt v. Washington Apple Advertising Comm'n,* 432 U.S. 333, 347, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977). Here, Plaintiff alleged in its complaint, and Defendant does not contest, that the value exceeds $75,000. Thus, if this were a justiciable controversy, diversity jurisdiction exists.

**C. Abstention Under *Burford* and *Younger***

If the Court did have jurisdiction in this matter, then it must determine whether to abstain from extending jurisdiction. In its summary judgment motion, Defendant asserts that this case should be dismissed under the abstention doctrine. Defendant cites two cases, *Burford* and *Younger,* in support of its contention that the court should abstain from exercising jurisdiction. Plaintiff counters that neither is applicable here.

Under *Burford,* abstention is appropriate when there is a need to defer to complex state administrative procedures. *Burford* abstention is appropriate where (1) the case presents a difficult issue of state law, (2) the case is in an area of important state policy, and (3) there is a unified state enforcement mechanism for the rights in question. *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943); *New Orleans Pub. Serv. Inc. v. Council of New Orleans,* 491 U.S. 350, 361–62, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989). This type of abstention is appro-

priate in order to avoid needless conflict with the administration by a state of its own affairs. 17A CHARLES ALLEN WRIGHT, ARTHUR R. MILLER, EDWARD H. COOPER, FEDERAL PRACTICE & PROCEDURE § 4241 (3d ed.2007). In contrast, *Younger* abstention is appropriate where state court proceedings are pending. *Younger v. Harris*, 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971).

■ Although Plaintiff requests resolution of seemingly unsettled State law questions, the issues at bar fall squarely within the *Burford* parameters: Plaintiff has presented difficult issues of state law, gaming is arguably an area of important state policy in Texas, and the Texas Lottery Commission (TLC) provides the unified State enforcement mechanism for some aspects of gaming law in Texas. Moreover, both the TLC and Office of the Attorney General provide an administrative procedure for organizations and individuals to request advisory opinions regarding the legality of proposed gaming actions.

Certification to the Texas Supreme Court to answer the state law question at issue here would be ideal. *See Lehman Bros. v. Schein*, 416 U.S. 386, 94 S.Ct. 1741, 40 L.Ed.2d 215 (1974)(holding that certification to the state supreme court rests in the sound discretion of the federal court, and that certification in the long run saves time, energy and resources, as well as helps to build a cooperative judicial federalism). However, under the Texas Constitution, certification must come from a federal appellate court. TEX. CONST. art. V, 3–c(a). As such, certification is not an option available to this court.

Therefore and in light of the above, this court finds that abstention is required in the case at bar.

## II. The Merits of Plaintiff's Claims

The heart of Plaintiff's claim involves the legality of gaming under Texas law. Although Plaintiff originally listed five requests for relief, per the parties, the only request remaining is for a declaratory judgment affirming G2's ability to operate a "charitable sweepstakes" benefitting the VFW–Odessa.

Plaintiff enthusiastically offers expert testimony from Mr. Nick Farley, "an expert and certification specialist." Pla.'s Supp. Br. 1. While this court does not deny that Mr. Farley has expertise regarding computer programmed gaming, he is not an attorney or other legal expert, and this case requires careful consideration not only of the mechanics of the VFW–Odessa's "charitable sweepstakes," but also of gaming law. As such, while Mr. Farley's opinion is helpful to this court in its understanding of how the VFW–Odessa game, contest, or sweepstakes actually functions, his opinion alone is not sufficient. Instead, if this court had jurisdiction, it must analyze the legality if the VFW–Odessa's "charitable sweepstakes" under applicable federal and State law.[8]

### A. Texas Gaming Law

The Constitution of the State of Texas commands the Legislature to pass laws prohibiting lotteries and gift enterprises, and allows passage of laws permitting certain bingo games, charitable raffles, and a state lottery. TEX. CONST. art. III, § 47. Generally speaking, then, the policy in Texas lies against lotteries and gift enterprises. Determinations regarding the legality of specific gift enterprises are fact specific in the gaming context, and are

---

8. The findings below are to be understood in the context of this Court's determination that it currently lacks jurisdiction, and that even if jurisdiction was established, the Court would apply the abstention doctrine and choose not to rule on the merits.

determined not by the name of the contest, but rather by the nature of the game. *Smith v. State,* 17 Tex. 191 (1856)("... courts will inquire, not into the name, but the game, to determine whether it is a prohibited game ...").

Statutory gaming law in Texas is currently found in at least five provisions: the Alcoholic Beverage, Business & Commerce, Occupations, Government, and Penal Codes. In summary, none of the four civil codes listed, which explicitly allow and regulate certain types of games or contests, is applicable to Plaintiff's "charitable sweepstakes."

### 1. Texas's Civil Statutes

▮ Plaintiff cites to the Texas Alcoholic Beverage Code and submits a letter from the TABC that seemingly sanctions Plaintiff's "charitable sweepstakes." [9] This letter, however, only addresses §§ 102.07(d) and 108.061 of the Alcoholic Beverage Code, which this court does not view as applicable to Plaintiff. Section 108.061 provides:

> Notwithstanding the prohibition against prizes given to a consumer in § 108.06 and subject to the rules of the commission, *a manufacturer or nonresident manufacturer* may offer a prize to a consumer if the offer is a part of a promotional sweepstakes activity. A purchase or entry fee may not be required of any person to enter in a sweepstakes authorized under this section. A person affiliated with the alcoholic beverage industry may not receive a prize from a sweepstakes promotion.

TEX. ALC. BEV.CODE ANN. § 108.061 (emphasis added). Section 108.04(17) defines a "manufacturer" as "a person engaged in the manufacture or brewing of beer, whether located inside or outside the state." Plaintiff offers no assertions that either it or the VFW–Odessa is an alcoholic beverage manufacturer under Texas law. Therefore, while § 108.061 explicitly allows a sweepstakes conducted by alcoholic beverage manufacturers, the explicit allowance does not reach Plaintiff's "charitable sweepstakes."

▮ Under Texas's Sweepstakes Act, found in the Business & Commerce Code, a "sweepstakes" is defined as "a contest that awards one or more prizes based on chance or the random selection of entries." TEX. BUS. & COMM.CODE §§ 45.001(7). "Conducting" a sweepstakes means "distributing any material that promotes a sweepstakes, describes the prize or prizes, states one or more of the sweepstakes rules, *includes any current or future opportunity to enter the sweepstakes,* or provides any method for the recipient of the material to obtain any additional information about the sweepstakes." § 45.001(2)(emphasis added). Section 45.003(g) states that "if the only use of the mail is for consumers to return their entry forms to the sponsor of the contest, then this chapter does not apply to that sweepstakes."

Plaintiff asserts that the only usage of the mail is to provide entrants an alternative method for obtaining an entry code for the "charitable sweepstakes," not for returning entry forms. However, when the requestor's entry code is returned to him or her, Plaintiff's are providing a "current or future opportunity to enter the sweepstakes." Therefore, Plaintiff is "conducting" a sweepstakes through the mail.

The Sweepstakes Act regulates certain "sweepstakes" [10] where any single prize

---

9. The letter is in reference to a previous, nearly identical sweepstakes run by the VFW–Odessa, which the TABC ostensibly sanctioned in its interpretation. This interpretation was limited to the provisions contained within the Alcoholic Beverage Code.

10. Texas has a unique set of regulations that govern direct mail sweepstakes. If you con-

awarded is valued at $50,000 or more. Since Plaintiff's "charitable sweepstakes" involves prizes no greater in value than $600, the regulations contained in the Sweepstakes Act are not applicable in this instance. TEX. BUS. & COMM.CODE § 45.003(j).

■ Under the Charitable Raffles provision of the Texas Occupations Code, a "raffle" is "the award of one or more prizes by chance at a single occasion among a single pool or group of persons who have paid or promised a thing of value for a ticket that represents a chance to win a prize." TEX. OCC.CODE. § 2002.002(6). Plaintiff's "charitable sweepstakes" does not qualify as a raffle for several reasons. First, Plaintiff's prizes are not awarded among a single pool or group or persons on a single occasion. Rather, the pool of participants increases until the finite set of entry codes is distributed or the time period for the "charitable sweepstakes" ends. In addition, prizes are awarded as partici-

pants enter a winning entry code—which could span several days or weeks—not on one single occasion. Plaintiff would likely agree with this Court's assessment that its "charitable sweepstakes" is not a raffle, given that in order to be allowable under the Occupations Code, prizes must be non-cash. *See* § 2002.056.

■ Under the Bingo Enabling Act portion of the Occupations Code, the mechanics of Plaintiff's "charitable sweepstakes" is, in essence, an electronic scratch-off game. Participants receive a three-digit code upon either making a donation to the VFW–Odessa, or by requesting an entry code via mail. The participant must then go to a computer station located on-site at the VFW–Odessa.

Although Plaintiff strongly disagrees, this type of game is more reminiscent of that contemplated by the Occupation Code's definition of a "bingo" game: "except as provided by Section 2001.551, a

---

duct a sweepstakes through the mail in which any one prize has an approximate retail value of $50,000 or more, you may not:

- Automatically enter an individual in a sweepstakes because the individual has made a purchase.
- Use an order form that has any role in the operation of a sweepstakes.
- Use a mechanism for entering a sweepstakes that: (a) has any connection to making a purchase; (b) is not identical for all recipients; and (c) does not contain the following disclosure: "Buying Will Not Help You Win. Your chances of winning without making a purchase are the same as the chances of someone who purchases something. It is illegal to give any advantage to buyers in a sweepstakes."
- Allow persons to choose the preferred characteristics of a prize unless those choices are: (a) made on the entry form; and (b) are not connected to making a purchase.
- Offer any gift, premium, giveaway, sweepstakes, or contest during the thirty-day period immediately following a sweepstakes.
- Represent or imply that a person has won a sweepstakes, or ask a person for any infor-

mation that may imply the person has won a prize, unless the person has won a prize.
- Represent or imply that a person must comply with a restriction to enter the sweepstakes, unless all individuals have to comply with that restriction.
- Use a scratch-off device in a sweepstakes solicitation.
- Represent or imply that a purchase will enhance a person's chances of winning.
- Make any misrepresentation regarding the sweepstakes.
- Award multiple prizes unless the prizes are awarded on the same date and through the same selection process.
- Fail to accurately identify the prizes to be awarded and the dates they will be awarded.
- Use more than one address to accept sweepstakes entries.
- Use the address for entries for any purpose other than to accept entries.

If no single prize offered in the sweepstakes has a value of $50,000 or more, the restrictions set forth above should not apply. *See* TEX. BUS. & COM.CODE ANN. § 45.002.

specific game of chance, commonly known as bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols conforming to randomly selected numbers or symbols." The enforcement subchapter of the section on gaming defines a "bingo" or "game" as "a specific game of chance, commonly known as bingo or lotto, in which prizes are awarded on the basis of designated numbers or symbols on a card conforming to numbers or symbols selected at random, whether or not a person who participates as a player furnishes something of value for the opportunity to participate." § 2001.551(a). "Pull-tab bingo" means "a form of bingo played using tickets with perforated break-open tabs, made of paper or paper products, the face of which is covered from view to conceal numbers, letters, or symbols, *some of which have been designated in advance as prize winners*." § 2001.002(24)(emphasis added).

SB 1110 and HB 2206 are identical companion bills that were presented to the Texas Senate and House of Representatives, respectively, that are currently[11] pending in the legislature. The text of the bills would change the text of § 2001.409(b): "a licensed authorized organization may use a card-minding device on the organization's bingo premises during a bingo occasion to display a commission-approved pull-tab bingo ticket to a bingo player." In essence, the bill would legalize an electronic pull-tab machine. The implication, thus, is that electronic pull-tab machines *are not currently* legal under Texas law.

The undersigned acknowledges that the similarities between Plaintiff's "charitable sweepstakes" and an electronic pull-tab are conceptual; the specific language of the Bingo Enabling Act describing pull-tabs as being in paper format prevent its application to the game at bar in this instance.

### 2. Texas's Criminal Statutes

The Texas Penal Code criminalizes possession of gambling devices, which it defines as "any electronic, electromechanical, or mechanical contrivance not excluded under Paragraph (B) that for a consideration affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the contrivance."[12] Plaintiff does not contest that the sweepstakes affords an element of chance and that cash prizes are awarded. Plaintiff does contest the consideration element. At first glance, this Court agreed with Plaintiff that the element of consideration was missing from the sweepstakes. However, a closer inspection of the consideration element is required.

"Consideration" in Texas is a present exchange bargained for, in return for a promise. *Alex Sheshunoff Mgmt. Servs. v. Johnson*, 124 S.W.3d 678, 684 (Tex.App.-Austin 2003). It consists of either a benefit to the promisor, or a loss or detriment to the promisee. *Fort Worth Indep. School Dist. v. City of Fort Worth*, 22

---

**11.** As of April 16, 2007, HB 2206 is out of committee and received a favorable report with substitutions. SB 1110 is still in committee.

**12.** Under the statute, "the term 'gambling devices' explicitly includes, but is not limited to, gambling device versions of bingo, keno, blackjack, lottery, roulette, video poker, or similar electronic, electromechanical, or mechanical games, or facsimiles thereof, that operate by chance, or partially so, that as a result of the play or operation of the game award credits or free games, and that record the number of free games or credits so awarded and the cancellation or removal of the free games or credits ..." TEX. PENAL CODE § 47.01(4)(A).

S.W.3d 831, 843 (Tex.2000). A promisee suffers a legal "detriment" when, in return for a promise, the promisee surrenders a legal right that the promisee otherwise would have been entitled to exercise. *Northern Nat. Gas Co. v. Conoco, Inc.*, 986 S.W.2d 603, 607 (Tex.1998). For a "detriment" to act as consideration, it must induce the making of the promise, and the promise must induce the detriment. *Community Initiatives, Inc. v. Chase Bank*, 153 S.W.3d 270, 283 (Tex.App.-El Paso 2004, no pet).

In the lottery or gift enterprise context, consideration has been found where participants were, in essence, required to purchase a theater ticket in order to hear whether said participant had won, and in order to respond in time to claim the prize. *Cole v. State*, 133 Tex.Crim. 548, 112 S.W.2d 725 (1938). In addition, where a ball-throwing game requiring skill and payment to the operator for some of the balls thrown—with free games as the only rewards for winning—was alternated with "relaxation game" of bingo for substantial money prizes, conducted without charge and without requirement that participants play the ball-throwing game also, fees exacted of those who came to enjoy the cycle of amusement in the form of payment for the ball-throwing game, supplied the necessary consideration, and the entire scheme was enjoinable as a lottery and gambling. *Hoffman v. State*, 219 S.W.2d 539 (Tex.Civ.App.-Dallas 1949).

In *Brice v. State* however, participants had to register at the store, but did not have to buy anything or be present to win when the winners were announced. 156 Tex.Crim. 372, 242 S.W.2d 433, 434 (1951). Thus, even though the store benefitted from the advertising, the court found this did not rise to the level of consideration. *Id.* In *State v. Socony Mobil Oil Co.*, the Court of Civil Appeals contrasted *Brice* with *Cole* and found no consideration where a filling station paid for bingo cards but gave them away free to any and all persons who came to their stations to request them, and a local TV station broadcast games in which bingo cards were used with winners being awarded cash prizes. 386 S.W.2d 169 (Tex.Civ.App.-San Antonio 1964).

Some jurisdictions outside of the State of Texas have held that requiring a person to actually go to the location of the sweepstakes sponsor in order to participate constitutes consideration. *See Lucky Calendar Co. v. Cohen*, 19 N.J. 399, 117 A.2d 487, 496 (1955)(holding that consideration exists where a customer is burdened by having to visit the store where the coupons are being offered); *Knox Indus. Corp. v. State ex rel. Scanland*, 258 P.2d 910, 914 (Okla.1953)(element of consideration is present when the customer is "subjected to the sales appeal of the merchandise offered for sale" at the store offering the merchandise); *State v. Dorau*, 124 Conn. 160, 198 A. 573, 575–76 (1938)(arriving at a movie theater, the fact that a customer is more likely to buy a ticket is enough to satisfy the consideration element of a lottery).

Based upon the evidence of record in the case at bar, a participant in Plaintiff's "charitable sweepstakes" must go to the VFW -Odessa location and enter the entry code into the computer system to find out if he or she is a winner. While Plaintiff neither requires nor demands payment or donations from participants, participants are materially induced to patronize the VFW–Odessa, in that the entry codes must be taken to the location and entered into the VFW–Odessa's computer program. Given the Texas case law discussed above, merely requiring patronization is not enough to demonstrate that consideration is present in this gift enterprise. Even though Plaintiff's "charitable sweepstakes"

may violate Texas public policy under its constitution, Plaintiff has seemingly side-stepped state law. In the absence of explicit prohibition under Texas statutory or common law, Plaintiff's "charitable sweepstakes" is, in the opinion of this court, legal.

## B. Federal Gaming Law

At the federal level, the United States Postal Service and Federal Trade Commission possess jurisdiction to regulate and investigate sweepstakes and skill contests. Current federal law does not specifically forbid sweepstakes, but addresses them indirectly by forbidding lotteries, false representation, and unfair trade practices. 39 U.S.C. § 3005; *see also* S.Rep. No. 106–102, at 5 (1999). Under the Deceptive Mail Prevention and Enforcement Act, found at 39 U.S.C. § 3005, a sweepstakes, even if conducted by mail, is legal if it discloses the terms and conditions of the contest, the sponsor and the sponsor's address, the odds of winning, and discloses that an alternative free method of entry is available.[13] § 3001(k)(3)(A). "Sweepstakes" is defined as "a game of chance for which no consideration is required to enter." 39 U.S.C. § 3001(k)(1)(D). Participants in Plaintiff's "charitable sweepstakes" must travel to the VFW–Odessa and utilize the software program loaded onto their computers to find out if an entry code is a winner. This court has already discussed the issue of consideration above, but the provision also includes mailed matter that purports to be a sweepstakes. Plaintiff also argues that its sweepstakes is not "conducted" through the mail because Plaintiff only utilizes the Postal Service to send entry codes to participants when those individuals have requested entry without making a donation to the VFW–Odessa. However, the provisions of § 3001 encompass any mailed matter that "includes entry materials for a sweepstakes or promotion that purports to be a sweepstakes." § 3001(k)(3)(A)(i). Ergo, even though Plaintiff's "charitable sweepstakes" does not require consideration, because it purports to be a sweep-

---

**13.** Non-mailable matter includes sweepstakes material that:

(A)(i) includes entry materials for a sweepstakes or a promotion that purports to be a sweepstakes; and

(ii)(I) does not contain a statement that discloses in the mailing, in the rules, and on the order or entry form, that no purchase is necessary to enter such sweepstakes;

(II) does not contain a statement that discloses in the mailing, in the rules, and on the order or entry form, that a purchase will not improve an individual's chances of winning with such entry;

(III) does not state all terms and conditions of the sweepstakes, promotion, including the rules and entry procedures for the sweepstakes;

(IV) does not disclose the sponsor or mailer of such matter and the principal place of business or an address at which the sponsor or mailer may be contacted;

(V) does not contain sweepstakes rules that state—

(aa) the estimated odds of winning each prize;

(bb) the quantity, estimated retail value, and nature of each prize; and

(cc) the schedule of any payments made over time;

(VI) represents that individuals not purchasing products or services may be disqualified from receiving future sweepstakes mailings;

(VII) requires that a sweepstakes entry be accompanied by an order or payment for a product or service previously ordered;

(VIII) represents that an individual is a winner of a prize unless that individual has won such prize; or

(IX) contains representation that contradicts, or is inconsistent with sweepstakes rules or any other disclosure required to be made under this subsection, including any statement qualifying, limiting, or explaining the rules or disclosures in a manner inconsistent with such rules or disclosures; 39 U.S.C. § 3001(k)(3).

stakes, and because it is conducted through the mail, Plaintiff's sweepstakes mail-outs must conform to the requirements set forth in § 3001. If Plaintiff has done so, then its sweepstakes is compliant with the Deceptive Mail Prevention and Enforcement Act and not in violation of federal law.

## FINDINGS OF FACT

1. G2 is a corporation formed under the laws of the Sac and Fox Nation that has its principal place of business in Tulsa, Oklahoma. (Amended Final Trial Stipulations No. 3).

2. Defendant Midwest Gaming, Inc. (Midwest) is a Texas Corporation that has its principal place of business in Abilene, Taylor County, Texas. (Amended Final Trial Stipulations No. 4).

3. Midwest Gaming, Inc. operated amusement redemption games within the Midland/Odessa Division of the Western District of Texas, beginning in 2000. "Amusement Redemption Games" are defined, pursuant to Texas Penal Code § 47.01(4)(b), as any electronic, electromechanical, or mechanical contrivance designed, made, and adapted solely for bona fide amusement purposes if the contrivance rewards the player exclusively with noncash merchandise, prizes, toys, or novelties, or a representation of value redeemable for those items, that have a wholesale value available from a single play of the game or device of not more than 10 times the amount charged to play the game or device once or $5, whichever is less. (Amended Final Trial Stipulations No. 5).

4. In Odessa, Texas, Midwest operated amusement redemption games as a sweepstakes for approximately six weeks in 2006, from mid-July 2006 to the first week in September 2006. Midwest ceased operations as a sweepstakes in Odessa at the request of local law enforcement officials and returned to operations as an amusement redemption game for replays only. (Amended Final Trial Stipulations No. 6).

5. The Veterans of Foreign Wars of the United States (VFW) is a nonprofit organization formed pursuant to 26 U.S.C.A. 501(c)(19) and founded in 1899. Its mission is to support programs designed to increase awareness of the sacrifices of American's Veterans. It accomplishes this mission by establishing and maintaining programs to promote citizenship education, volunteerism, positive youth programs, and facilitation of medical, rehabilitative, educational and employment services for Veterans and their families. (Amended Final Trial Stipulations No. 7).

6. From an organizational standpoint, the VFW is comprised of a group of posts located in each of the fifty states. One of the five largest posts of the VFW is headquartered in Odessa, Texas, Post Number 4372 (VFW–Odessa). The VFW–Odessa is also an organization formed pursuant to 26 U.S.C. § 501(c)(19) as a nonprofit organization. (Amended Final Trial Stipulations No. 8).

7. To fund its mission and programs, the VFW and its individual posts rely almost exclusively on traditional methods of charitable fund-raising. One of the most successful and innovative of these methods involves conducting charitable sweepstakes which are visually unique from other sweepstakes methodology and which stimulate interest and participation in VFW charitable fund-raisers. (Amended Final Trial Stipulations No. 9).

8. The sweepstakes software and hardware supplied by G2 under contract to the VFW may have a similar appearance to, but differs operationally from amusement redemption games. (Amended Final Trial Stipulations No. 10; Hearing of February 22, 2007, testimony of Gary Watkins).

9. The G2 software system can create sweepstakes with any number of game pieces and with any number and type of prizes the sweepstakes operator requests. The G2 system and central server employed by VFW–Odessa in its sweepstakes distributes batches of sweepstakes game pieces, via the internet, to a local server. The entrant's computer requests that individual game pieces be revealed and the local server sends the results of revealing the game pieces to the entrant's computer. These results are revealed electronically. The G2 software draws from a finite set of game pieces with a predetermined finite number of prizes. It then utilizes audio and visual images rather than text to reveal whether the entry is a winner or non-winner and the amount of any prize awarded. This process is part of what makes this system unique. (Amended Final Trial Stipulations No. 11; Hearing of February 22, 2007, testimony of Gary Watkins; Exhibit P–12, Farley Report).

10. After consultation with and no apparent objection stated by local law enforcement agencies as part of regulatory and legal due diligence, the VFW–Odessa and G2 entered into an agreement whereby G2 would create, implement and oversee sweepstakes for VFW–Odessa. G2 also provided on-site video-conferencing allowing local families to interact with loved ones stationed overseas with the United States Military, inclusive of personnel posted in Afghanistan and Iraq. (Amended Final Trial Stipulations No. 12; Hearing of February 22, 2007, testimony of Gary Watkins).

11. The VFW–Odessa sought, and on July 14, 2006 received, stated approval from the Texas Alcoholic Beverage Commission (TABC) for an Internet based sweepstakes advertising and promotion that awarded cash prizes and used G2's sweepstakes software, which is the same as the software utilized by VFW–Odessa in its sweepstakes. (Amended Final Trial Stipulations No. 14; Hearing of February 22, 2007, testimony of Gary Watkins and Glen Gardner; Exhibit P–3, P–4 P–5).[14]

12. Midwest operated amusement redemption games within the Midland–Odessa Division of the Western District of Texas as a sweepstakes for approximately six weeks in 2006 from mid-July until the first week in September. Law enforcement requested that Midwest voluntarily cease operations. Midwest agreed to this request. A request was also made to VFW–Odessa to voluntarily cease operations. VFW–Odessa and G2 complied with this request. (Amended Final Trial Stipulations No. 16, 17, and 18; Hearing of February 22, 2007, testimony of Gary Watkins and Glen Gardner).

13. The VFW–Odessa sweepstakes rules specifically provide, and the VFW–Odessa sweepstakes were operated to provide:

**14.** This Court is not finding that TABC is the state agency authorized to approve or sanction the game, but simply finds TABC provided Defendant a letter stating it approved the game process.

a. Alternative means of entry or participation without a purchase or donation so that payment of money or purchase of an item is not necessary to participate or win;

b. A provision that making a donation does not increase the participant's chance of winning a prize;

c. That a participant's odds of winning are identical no matter the method of entry selected;

d. A clear statement as to the charitable beneficiary;

e. A clear statement as to the exact nature and number of the prizes to be awarded; and

f. The odds associated with winning each prize.

(Amended Final Trial Stipulations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins and Glen Gardner; Exhibit P–12, Farley Report).

14. No purchase or donation is required to win or participate in the VFW–Odessa sweepstakes. (Amended Final Trial Stipulations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins and Glen Gardner; Exhibit P–12, Farley Report).

15. A purchase or donation will not increase the chance of winning any prize in the VFW–Odessa sweepstakes. (Amended Final Trial Stipulations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins and Glen Gardner; Exhibit P–12, Farley Report).

16. The VFW–Odessa sweepstakes clearly and conspicuously discloses the exact number and type of prizes to be awarded and the odds associated with winning any given prize during the sweepstakes period. A list identifying winners of major prizes and the prizes that have been won is available at any time during the term of the sweepstakes. (Amended Final Trial Stipu-

lations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins; Exhibit P–12 (Farley Report)).

17. The VFW–Odessa sweepstakes clearly and conspicuously discloses the odds of winning each prize. (Amended Final Trial Stipulations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins; P–12 (Farley Report)).

18. The VFW–Odessa sweepstakes clearly and conspicuously discloses the duration and termination dates of each sweepstakes. (Amended Final Trial Stipulations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins; P–12 (Farley Report)).

19. The VFW–Odessa sweepstakes clearly and conspicuously discloses all restrictions and eligibility requirements. (Amended Final Trial Stipulations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins; P–12 (Farley Report)).

20. The VFW–Odessa sweepstakes clearly and conspicuously discloses that no purchase or donation is necessary to participate or win any prize. (Amended Final Trial Stipulations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins; P–12 (Farley Report)).

21. The VFW–Odessa sweepstakes clearly and conspicuously offers an alternative means of entry independent of purchase or donation. (Amended Final Trial Stipulations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins; P–12 (Farley Report)).

22. The VFW–Odessa sweepstakes clearly and conspicuously discloses the closing date of the event. (Amended Final Trial Stipulations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins; P–12 (Farley Report)).

23. Prizes in the VFW–Odessa sweepstakes are awarded from a finite set of game pieces. (Amended Final Trial Stipulations No. 11; Hearing of February 22, 2007, testimony of Gary Watkins; Exhibit P–12 (Farley Report)).

24. The number of prizes awarded in the VFW–Odessa sweepstakes is finite. (Amended Final Trial Stipulations No. 11; Hearing of February 22, 2007, testimony of Gary Watkins; Exhibit P–12 (Farley Report)).

25. The VFW–Odessa sweepstakes allows individuals to either request, without purchase or donation, sweepstakes game pieces by mail or to obtain game pieces, without purchase or donation, at the location of the sweepstakes during the hours the VFW–Odessa is open. (Amended Final Trial Stipulations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins; Exhibit P–12 (Farley Report)).

26. The operation of the VFW–Odessa sweepstakes in Odessa, Texas constitutes a sweepstakes as defined by TEX. BUS. & COM.CODE ANN. § 45.001(7) as it is a contest that awards one or more prizes based on the random selection of entries. (Amended Final Trial Stipulations No. 13; Hearing of February 22, 2007, testimony of Gary Watkins; Exhibit P–12 (Farley Report)).

27. No cash prize awarded in the VFW–Odessa sweepstakes has ever equaled or exceeded the sum of fifty thousand dollars ($50,000.00). (Amended Final Trial Stipulations No. 15; Hearing of February 22, 2007, testimony of Gary Watkins).

28. The VFW–Odessa is the charitable beneficiary of the VFW–Odessa sweepstakes. (Hearing of February 22, 2007, testimony of Gary Watkins and Glen Gardner).

29. The parties have agreed that Nick Farley, President of Nick Farley & Associates, is a nationally recognized expert with the requisite qualifications to offer opinions regarding the following subjects:

a. the requirements for a legal sweepstakes; and

b. the mechanics of the VFW–Odessa sweepstakes.

(Amended Final Trial Stipulations No. 16).

30. Mr. Farley has provided a report that was received in evidence as Exhibit No. 12 in a hearing held before this Court on February 22, 2007. (Exhibit P–12 (Farley Report)).

31. The report referenced in the Finding of Fact above concludes that with respect to each of the game themes created with the G2 software system for the sweepstakes operated by the VFW–Odessa:

a. each possesses its own finite set of sweepstakes results;

b. that each set of finite sweepstakes results is generated by the Server Computer, randomly stored and sequentially delivered to the participant at the Participant Access Terminal;

c. that due to the finite number of sweepstakes results and the defined quantity of game outcomes, a sweepstakes operator may publish a list of the exact number and type of prizes to be awarded, and the odds of winning any given prize;

d. the Point–of–Sale does not distinguish sweepstakes entries granted through a purchase from those granted by request with no purchase necessary;

e. all sweepstakes participants have the same chances of winning a prize

regardless of whether a purchase is made;

f.  while the participant may be required to participate in certain game themes to reveal the sweepstakes results, such action will have no bearing on the predetermined sweepstakes results that will be revealed to the participant;

g.  the participant cannot affect the outcome of the sweepstakes results, and cannot alter the odds of winning a prize;

h.  the game themes associated with the sweepstakes operated by VFW–Odessa perform in similar fashion as many other commercial sweepstakes offered to the public;

i.  the sweepstakes entries do not require a purchase or donation as a method is available to grant entries through no purchase;

j.  opening multiple game pieces does not alter the probability of attaining a given prize, or increase or decrease the likelihood of winning any given prize; and

k.  if a participant elects to reveal multiple sweepstakes game pieces simultaneously by engaging in sweepstakes play at higher Levels or Play Options, the result displayed to the participant will be a single prize value representing the cumulative total of all winning sweepstakes game pieces from those drawn or played and does not alter the participant's chances of winning any available prize.

(Hearing of February 22, 2007, testimony of Gary Watkins; Exhibit P–12 (Farley Report)).

32.  No disputes currently exist between the Plaintiff G2 and Defendant Midwest Gaming, Inc.

33.  Plaintiff G2 lacks standing to bring suit for the requested declaratory relief against Defendant Midwest Gaming, Inc.

### Conclusions of Law

1.  This Court does not have jurisdiction over the parties and the subject matter of this action pursuant to 28 U.S.C. § 1332.

2.  Even if this Court did have jurisdiction, abstention is appropriate.

3.  Sweepstakes are not generally prohibited by federal law and may be conducted in a manner that is compliant with all statutory and regulatory requirements.  (Memorandum Brief on Legality of VFW–Odessa Charitable Sweepstakes filed on February 20, 2007; Hearing of February 22, 2007).

4.  Sweepstakes are not generally prohibited in the State of Texas and may be conducted in a manner that is compliant with all statutory and regulatory requirements.  (Memorandum Brief on Legality of VFW–Odessa Charitable Sweepstakes filed on February 20, 2007; Hearing of February 22, 2007).

5.  Texas law defines "sweepstakes" as a "contest that awards one or more prizes based on chance or the random selection of entries." TEX. BUS. & COM. CODE. § 45.001(7).  (Memorandum Brief on Legality of VFW–Odessa Charitable Sweepstakes filed on February 20, 2007; Hearing of February 22, 2007).

6.  Pursuant to the Texas Business and Commerce Code, "[c]onducting" a sweepstakes "means distributing any material that promotes a sweepstakes, describes the prize or prizes, states one or more of the sweepstakes rules, includes any current or future opportunity to enter the sweepstakes, or provides any method for the recipient of the material to obtain additional

information about the sweepstakes." TEX. BUS. & COM.CODE. § 45.001(2). (Memorandum Brief on Legality of VFW–Odessa Charitable Sweepstakes filed on February 20, 2007; Hearing of February 22, 2007).

7. Under Texas law, a purchase or entry fee may not be required in order to enter a sweepstakes. TEX. ALCO. BEV.CODE ANN. § 108.061. Texas law does not contain any prohibition against a charitable entity accepting donations in conjunction with a legal sweepstakes, if alternative opportunities to enter, participate and win are available with no purchase or donation necessary. (Memorandum Brief on Legality of VFW–Odessa Charitable Sweepstakes filed on February 20, 2007; Hearing of February 22, 2007).

8. Under Texas law, a sweepstakes conducted through the mail must disclose the following:

a. The exact number and type of prizes to be awarded;

b. The odds of winning each prize;

c. The duration and termination dates of the promotion;

d. The availability of lists of winners of large prizes;

e. Any restrictions or eligibility requirements;

f. That no purchase or donation is necessary; and

g. The closing date of the event.

Tex. Business and Commerce Code Ann. §§ 45.001, 45.002, 45.003. (Memorandum Brief on Legality of VFW–Odessa Charitable Sweepstakes filed on February 20, 2007; Hearing of February 22, 2007).

## CONCLUSION

In light of this Court's decisions, the parties in this matter have several options, including filing suit against the proper authorities, appealing the jurisdictional ruling in this case so that the Fifth Circuit Court of Appeals may seek certification to the Texas Supreme Court, or lobbying the Texas Legislature for new law in line with current technological advances and resources. Plaintiff has not pursued the first or third option as yet.