# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 1, 2012

No. 11-40265

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff–Appellee

v.

DANIEL PATRICK DAVIS; PHILLIP DELL CLARK,

Defendants–Appellants

Appeals from the United States District Court
for the Eastern District of Texas

Before REAVLEY, PRADO, and OWEN, Circuit Judges.

EDWARD C. PRADO, Circuit Judge:

Defendants–Appellants Daniel Patrick Davis and Phillip Dell Clark were convicted of illegal gambling, conspiring to commit illegal gambling, and money laundering for their roles in a "sweepstakes" promotion at three Internet cafés in Texas. They challenge their convictions on a variety of grounds, but contend principally that there is insufficient evidence to support their convictions and that the district court erred in refusing to allow them to present a "mistake-of-law" defense. The Government concedes that there is insufficient evidence to support their convictions for money laundering, which we now reverse; we affirm their other convictions.

No. 11-40265

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. The Statutory Framework

Davis and Clark were charged with violating and conspiring to violate 18 U.S.C. § 1955. Section 1955 makes it a federal crime to conduct, finance, manage, supervise, direct, or own all or part of an "illegal gambling business," defined as a gambling business which (1) violates the law of the state in which it is conducted, (2) involves five or more persons who conduct, manage, supervise, direct, or own all or part of such business, and (3) continuously operates for a period of more than thirty days or has a gross revenue of $2,000 or more on any single day. The defendants concede the second two elements; the crux of their appeal is that the first element is not satisfied because their conduct did not violate Texas state law.

The superseding indictment alleges that Davis and Clark operated "electronic gambling devices" in violation of three[1] Texas state laws: gambling promotion, keeping a gambling place, and possessing a gambling device, equipment or paraphernalia. Tex. Penal Code Ann. §§ 47.03, 47.04, 47.06. As relevant to the conduct involved here, a person is guilty of "gambling promotion" if the Government proves that he "intentionally or knowingly" "operates or participates in the earnings of a gambling place" or "for gain, sets up or promotes any lottery or sells or offers to sell or knowingly possesses for transfer, or transfers any card, stub, ticket, check, or other device designed to serve as evidence of participation in any lottery." *Id.* § 47.03(a)(1), (5). A person is guilty of "keeping a gambling place" if the Government proves that he "uses or permits another to use as a gambling place any real estate, building, room, tent, vehicle, boat, or other property whatsoever owned by him or under his control, or rents

---

[1] A fourth Texas state law is also listed on the indictment—communicating gambling information. Tex. Penal Code Ann. § 47.05. The facts of this case do not support that crime and it was not charged to the jury.

or lets any such property with a view or expectation that it be so used." *Id.* § 47.04(a). A "gambling place" is "any real estate, building, room, tent, vehicle, boat, or other property whatsoever, one of the uses of which is . . . the conducting of a lottery or the playing of gambling devices." *Id.* § 47.01(3). A person is guilty of "possession of gambling device, equipment, or paraphernalia" if, "with the intent to further gambling, he knowingly owns, manufactures, transfers, or possesses any gambling device that he knows is designed for gambling purposes or any equipment that he knows is designed as a subassembly or essential part of a gambling device" or "if, with the intent to further gambling, the person knowingly owns, manufactures, transfers commercially, or possesses gambling paraphernalia." *Id.* § 47.06(a), (c).

To obtain a conviction under any one of those Texas statutes, the Government would have to prove either that a gambling device or a lottery was involved. A "gambling device" is "any electronic, electromechanical, or mechanical contrivance . . . that *for a consideration* affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the contrivance." *Id.* § 47.01(4) (emphasis added). A lottery requires: "(a) A prize or prizes[;] (b) the award or distribution of the prize or prizes by chance; [and] (c) the payment either directly or indirectly by the participants of a *consideration* for the right or privilege of participating." *Brice v. State*, 242 S.W.2d 433, 434 (Tex. Crim. App. 1951) (internal quotation marks omitted) (emphasis added). Therefore, in order to convict Davis or Clark the Government had to prove the existence of some consideration exchanged for the privilege of playing the sweepstakes. The sole issue in each of the defendants' insufficiency challenges is whether such consideration was proved.

No. 11-40265

## B.  The Sweepstakes' Mechanics

In addition to providing Internet access and word processing, faxing, and copying services, each of the three Internet cafés involved in this case—the Dolphin in Port Arthur, Texas; the Double Click in Henderson, Texas; and the Nederland in Nederland, Texas—offered a sweepstakes promotion that allowed customers to win cash prizes.  The sweepstakes ran on computer software that, at the outset, created a finite number of "entries."  Within that universe of entries, the software designated particular entries as winning entries, and assigned a cash value to each winning entry.  The software then shuffled the universe of entries so that the winning entries were randomly distributed.

There were three ways for sweepstakes participants to acquire entries.  First, by purchasing Internet time at one of the cafés; each dollar of Internet time purchased came with 100 entries.  Second, by requesting entries in person at the café, up to 100 entries a day.  Or third, by requesting entries by mail, also up to 100 entries a day.[2]  After obtaining entries, participants could choose among three ways to find out if their entries were winners; the method chosen did not affect whether a particular entry was a winner or a loser because, as noted earlier, whether it was a winner or a loser was predetermined by the computer software.  First, participants could ask the clerk who sold them Internet time to instantly reveal whether any of their entries were winners and if so, what their total winnings were.  Second, participants could swipe at a computer terminal the card issued by the cafés that electronically stored Internet time and entries, and then choose "reveal" or "quick win" on the screen.  That option would, like the instant reveal, immediately tell the participant whether or not the entries were winners, and if so, for how much.

---

[2] Although it was undisputed that entries could be requested by mail, the posters advertising free entries by mail did not include a mailing address.

4

Third, participants could reveal whether their entries were winners by playing a variety of casino-like games available on each computer terminal.  For example, one game available looked like a video slot machine. Clicking "reveal" caused the reels to rotate and stop, revealing whether or not the played entries were winners, and for how much.  Each time "reveal" was clicked, twenty-five entries were played. Winnings were displayed on the screen, and the participant could cash out those winnings in two ways.  The participant could go to a clerk and receive cash, or the participant could use the winnings to purchase more Internet time at a computer terminal.  The purchase of Internet time, as before, came with entries—100 for each dollar of Internet time.  Playing the entries on the computer terminals did not reduce the amount of Internet time available to the participant.  After playing the sweepstakes on the computer terminals, participants received a receipt listing any winnings from their entries and "Net Time."  Nick Farley, an expert called by the defendants' co-defendant Cecil Stephens, testified that he "believe[d]" the number following "Net Time" was the amount of Internet time remaining.  One receipt entered into evidence listed "Net Time, 356,397"; another listed "Net Time, 356,400."  When asked if that was the number of minutes of Internet time remaining on that customer's account, Farley responded "Probably, yes."

## C.  Police Investigations

### 1.  The Dolphin

Because of complaints that people had been gambling and losing large sums of money at the Dolphin, Port Arthur Police Officers Shawn Perron and Chris Billiot, while undercover, visited the Dolphin.  The Dolphin's windows were tinted and a sign outside the building—which was part of a strip-center—advertised the business as Dolphin Internet.  Upon entering, Perron saw several tables containing "five or six" computers each, a main counter, an area with food, and another room containing about fifteen computers.  He observed

"several" people at the computers playing "what appeared to be eight-liner or electronic slot machine games." Nobody in the Dolphin was using the computers to do anything but play the sweepstakes. Perron was asked for his identification, signed "some sort of a ledger or a membership type ledger," and was given a card with a magnetic strip. He purchased $20 of Internet time and won $37 playing the sweepstakes. He went back to the Dolphin later that day, purchased $40 of Internet time, and won $117 playing the sweepstakes. A month later he visited again, purchasing $40 of Internet time and winning $233. He made a fourth visit about two months after his third, purchased $20 of Internet time, and won $15 playing the sweepstakes.

Billiot testified[3] that when he visited the Dolphin, he was issued a card that he took to a machine that worked "like a reverse ATM machine" in which he put money, swiped his card, and sat down to play the sweepstakes. He stated that in his recollection, "when you go into the sweepstakes to a game, it converts those minutes into a cash value to where you can play these different type machines . . . like slot machines." Unlike Perron, Billiot did not win anything while playing the sweepstakes. Billiot testified that in his recollection, once he had used up all of his entries, he could not go back to surf the Internet. He admitted during cross-examination, however, that he did not ask a Dolphin

---

[3] Davis and Clark argue that some of the testimony by uniformed police officers was prejudicial because the officers made "conclusions of law" by referring to the computers in the defendants' cafés as "gambling devices." The district court cautioned the jury three times—once before the start of trial, once during a police officer's testimony, and once during its charge—that calling a device a gambling device is not itself evidence that the machine is in fact a gambling device, and that "[t]he government must prove to your satisfaction that the activity is gambling or that the equipment possessed is a gambling device by credible evidence about and beyond the characterization of the activity or equipment by simply calling it a particular name." The repeated cautionary instructions by the district court rendered harmless any improper opinion testimony offered by the police officers. *See United States v. Gutierrez-Farias*, 294 F.3d 657, 663 (5th Cir. 2002).

No. 11-40265

clerk for assistance, and it was possible that all of his Internet time was still available.

### 2. *The Nederland*

Based on information that an illegal gambling business was being conducted at the Nederland, Nederland Police Department Officer Casey Maxwell visited the Nederland while undercover. Like the Dolphin, the Nederland was located in a strip-mall. Upon entering, Maxwell was asked to sign a piece of paper stating that he was not gambling, he was buying Internet time and playing a sweepstakes. He was handed a "credit card looking card" which was loaded with $5 free because it was his first visit, led to one of the computer terminals, offered free food, and shown how to access the sweepstakes games. There were about twelve other people sitting at computers, all playing the sweepstakes. Maxwell bought $40 of Internet time, played the sweepstakes, and did not win any money. After using all of his entries, he testified that he "couldn't do anything else on the computer," but when asked if he had tried, he said, "No."

Maxwell visited the Nederland again about a week later. He noticed signs saying "Win Cash Prizes" and "All of Your Favorite Games." Maxwell purchased $40 of Internet time from an ATM-like terminal and played the sweepstakes without success. He purchased another $40 of Internet time and this time won about $640. Maxwell stated that as he played the sweepstakes and won, the entries displayed on the screen continuously went down, and the money he won was displayed in a different box on the screen. He approached a clerk to cash out and was told that because he won more than $500 he had to give the clerk his driver's license and social security numbers to file with the IRS. Maxwell asked if he could continue to play his winnings, was told yes, played the winnings down to $599, then cashed out and received $599 in cash.

7

No. 11-40265

### 3. *The Double Click*

There was no testimony by police officers regarding their investigation into the Double Click. Delores Ridens, the manager of the Double Click, testified as a cooperating witness. She estimated that Double Click customers actually used "a little less" than $100 worth of Internet time each week. That amount was dwarfed by the $27,770 in Internet time sales during a representative week.

## D. Charges and Trial

After these investigations by local police, a federal grand jury indicted the defendants, along with five others,[4] in a nine-count superseding indictment. Davis and Clark were each charged with one count of conspiring to "conduct, finance, manage, supervise and direct an illegal gambling business, said illegal gambling business involving the operation of electronic gambling devices" in violation of 18 U.S.C. §§ 371 and 1955. In addition to that conspiracy charge, Davis was charged with three counts of illegal gambling in violation of 18 U.S.C. § 1955 and two counts of money laundering in violation of 18 U.S.C. § 1957. Clark was charged with two counts of illegal gambling and two counts of money laundering.

Throughout the trial, Davis and Clark each maintained that they were entitled to present a mistake-of-law affirmative defense. After holding a hearing, at which both defendants testified, the district court denied the defendants' request in a oral order read into the record.

At the end of the Government's case, Davis and Clark each moved for a judgment of acquittal. The district court denied those motions. Davis testified,

---

[4] The others charged in the superseding indictment were: Cecil Stephens, a part owner of the Double Click, who was tried with Davis and Clark but is not part of this appeal; Virginia Slaughter, manager of the Dolphin, who testified as a cooperating witness; Amirali "Azim" Sumar, a part owner of the Nederland, who testified as a cooperating witness; Mukhtiar Khuwaja, Sumar's brother-in-law and a clerk at the Nederland; and Delores Gail Ridens, the Double Click's manager, who testified as a cooperating witness.

called a witness on his behalf, and elicited testimony from Nick Farley, the expert called by his co-defendant Cecil Stephens, in an attempt to bolster Farley's credibility. Clark did not testify or call any witnesses, but he questioned Davis, elicited favorable testimony from Farley, and referred to Farley's testimony during summation. Neither Davis nor Clark renewed his motion for judgment of acquittal at the close of all the evidence.

The jury returned a verdict, finding each defendant guilty on multiple counts. Davis was convicted of conspiracy to commit illegal gambling, two counts of illegal gambling, and two counts of money laundering. Clark was convicted of conspiracy to commit illegal gambling, two counts of illegal gambling, and two counts of money laundering. Davis was sentenced to a year and a day of imprisonment, which was below the applicable Guidelines range of 18–24 months. Clark was sentenced to two years of probation, which was also below the applicable Guidelines range of 24–30 months. The defendants timely appealed, invoking our jurisdiction under 28 U.S.C. § 1291.

## II. DISCUSSION

As stated previously, Davis and Clark principally contend that there is insufficient evidence to sustain their convictions for illegal gambling (and conspiracy to commit illegal gambling) because their conduct did not violate Texas state law. Further, the defendants argue that the district court erred in refusing to allow them to put on a mistake-of-law defense.

### A. Sufficiency of the Evidence[5]

#### 1. Standard of Review

"We review properly preserved claims that a defendant was convicted on insufficient evidence with substantial deference to the jury verdict, asking only

---

[5] As an initial matter, the Government concedes that the evidence was insufficient to support the defendants' money laundering convictions, and agrees that those convictions must be reversed. We therefore reverse these convictions.

whether a rational jury could have found each essential element of the offense beyond a reasonable doubt." *United States v. Delgado*, 672 F.3d 320, 330 (5th Cir. 2012) (en banc) (internal quotation marks omitted). However, where a defendant moves for a judgment of acquittal at the end of the Government's case but, after presenting evidence, fails to renew that motion, the defendant has forfeited his insufficiency challenge and our review is for a "manifest miscarriage of justice."[6] *United States v. Salazar*, 542 F.3d 139, 142 (5th Cir. 2008). Because Davis failed to renew his motion for a judgment of acquittal after he testified, we review his insufficiency claim for a manifest miscarriage of justice.

A manifest miscarriage of justice exists "only if the record is devoid of evidence pointing to guilt, or because the evidence on a key element of the offense is so tenuous that a conviction would be shocking." *United States v. McDowell*, 498 F.3d 308, 312 (5th Cir. 2007) (internal quotation marks and ellipses omitted). We consider the evidence "in the light most favorable to the government, giving the government the benefit of all reasonable inferences and credibility choices." *Id.* (internal quotation marks omitted).

The proper standard of review for Clark's claim is a closer question. Clark did not testify or call any witnesses, but he questioned Davis and elicited favorable testimony from Farley, which he referred to during closing arguments. Had Clark not questioned Davis or elicited testimony from Farley, he would not have needed to renew his motion for a judgment of acquittal at the end of all the evidence merely because his co-defendant testified. *United States v. Arias-Diaz*, 497 F.2d 165, 168–69 (5th Cir. 1974). If we were to determine that Clark functionally "presented evidence" by questioning Davis and Farley, he too would

---

[6] We have recently explained that forfeited insufficiency claims are reviewed, like other forfeited claims, by employing the usual four-prong plain error test. *United States v. Delgado*, 672 F.3d 320, 330–31 (5th Cir. 2012) (en banc). "[T]he 'manifest miscarriage of justice' formulation is itself a reasonable restatement of the four-prong test." *Id.* at 332 n.9.

have forfeited his insufficiency claim by failing to renew his motion for a judgment of acquittal at the end of all the evidence. We need not reach this question because we would affirm Clark's convictions under either the manifest miscarriage of justice standard or the more lenient standard we apply to preserved insufficiency claims.

### 2. Analysis

As noted above, both Davis's and Clark's insufficiency challenges turn on whether or not there was evidence that sweepstakes participants exchanged some consideration for the privilege of playing the sweepstakes. The defendants argue that consideration in this context means paying money in exchange for playing. They maintain that the record does not contain any evidence that sweepstakes participants did, or even could, pay to play the sweepstakes. Participants either received a limited number of sweepstakes entries each day without purchasing Internet time, or received entries free with the purchase of Internet time—such Internet time, the Government concedes, was sold at fair market value.[7]

The defendants are correct that consideration exists if sweepstakes participants must pay money for the privilege of playing or if participants who pay have better chances of winning than non-paying participants. In *Cole v. State*, for example, the Texas Court of Criminal Appeals affirmed the conviction of a theater owner who randomly picked a name from a pool of names that did

---

[7] Davis argues that the district court erred by excluding his expert, Thomas Fricke, who he claims would have testified that the Internet time sold at the cafés had real value and was sold at the market rate. As the Government concedes, there was testimony at trial supporting the fact that the cafés sold Internet time at competitive prices. The district court excluded Fricke because "his testimony amounted to his opinion that the operation conducted by Defendants resembled others in the national gaming industry" which was "irrelevant to the inquiry of whether this operation complied with Texas law." We cannot say that the district court abused its discretion, *MCI Commc'ns Servs., Inc. v. Hagan*, 641 F.3d 112, 118 (5th Cir. 2011), in excluding Fricke's largely irrelevant testimony, especially where the single fact Davis argues Fricke would have told the jury was not contested by the Government.

not require payment to enter, but the theater owner limited the amount of time in which the winner could claim her prize to such an extent that, in all practicality, the only people who could win were those paying customers in the theater. 112 S.W.2d 725, 727–27, 730 (Tex. Crim. App. 1937). The court in *Brice v. State* distinguished *Cole* in overturning the conviction of a store owner who gave away prizes during the three-day opening of his store by randomly drawing a registration card out of the thousands submitted in person each day by participants who were not required to buy anything or pay money. 242 S.W.2d 433, 434 (Tex. Crim. App. 1951). The *Brice* court reasoned:

> [I]n the absence of any character of favoritism shown to customers, the [gambling statute] is not violated under a plan whereby a merchant awards a prize or prizes by chance to a registrant without requiring any registrant to be a customer or to purchase merchandise or to do other than to register without charge at the store, though the donor may receive a benefit from the drawing in the way of advertising.

*Id.*

A more recent case with facts similar to those in this case also informs the scope of consideration. Jester's store contained machines that, when a dollar was inserted, dispensed a three minute pre-paid telephone card and displayed 100 credits. *Jester v. State*, 64 S.W.3d 553, 554–55 (Tex. App.—Texarkana 2001, no pet.). The credits could be used to play a game on the machines through which it was possible to win more credits, which in turn were redeemable for gift certificates. *Id.* at 555. It was also possible to play for free (to a limit of 100 credits a day) by mailing a request form, receiving a certificate in the mail, and showing the certificate to the clerk at the store. *Id.* Jester argued that the scheme did not constitute a lottery, but was instead a legal sweepstakes because consideration was lacking—the customers either put in a dollar and received a phone card or played for free. *Id.* at 556–57.

No. 11-40265

The court stated that "consideration regarding lotteries should be measured by the same rule as in contracts," *id.* at 557, and determined on the facts presented that a reasonable jury could have found the presence of consideration beyond a reasonable doubt, *id.* at 558. The court explained that its decision turned on "whether the sweepstakes was intended to promote the sale of telephone cards or whether the telephone cards were there as an attempt to legitimize an illegal gambling device." *Id.* Driving the court's finding that the telephone cards were an attempt to legitimize an illegal gambling device, and that therefore the consideration requirement was satisfied, were the following facts: the telephone cards cost "much" more per minute than the market cost of telephone time; there was testimony that the telephone cards did not work; there was evidence that players did not value the telephone cards, and that some players did not know they even were telephone cards; there was testimony that the employees were aware that the customers did not value the telephone cards; there were no signs on the outside of the building advertising or indicating that telephone cards were sold at the store; and no employee tried to sell customers on the telephone cards. *Id.*

The court concluded:

The evidence in this case was legally sufficient for the jury to infer that the main purpose and function of the machines, and the business, was to induce people to play the game, agreeing to gain or lose something of value at least partially by chance, and not to promote telephone cards; that it was Jester's intent to structure the business to entice players to exchange money for chances to play, which they did; and that the telephone cards were not the primary subject of the transaction, but mere subterfuge.

Although testimony was provided regarding the redemption of the free games and the telephone card minutes, as well as the higher market price for smaller denominated telephone cards and Jester's intention to promote the telephone cards, the jury's determination was not so contrary to the overwhelming weight of the evidence as

to be clearly wrong and unjust, and therefore, the evidence was factually sufficient as well.

*Id.* at 558–59. As the Jester court's reasoning shows, the consideration element in the Texas gambling statutes can be fulfilled without an explicit exchange of money for the opportunity to participate in a sweepstakes. We therefore reject the defendants' argument that consideration is limited to the exchange of money for the privilege of participating.[8]

Here, as in *Jester*, there is legally sufficient evidence from which a reasonable fact-finder could infer that the sale of Internet time at the defendants' cafés was an attempt to legitimize an illegal lottery. Customers' receipts indicating over 300,000 minutes of Internet time remaining were evidence that the customers did not value the Internet time they had purchased. Further evidence that customers did not value their Internet time was the investigating police officers' uniform testimony that during each of their visits to a café, all of the people there were only engaged in playing the sweepstakes—not accessing the Internet or using any of the other services provided. In addition to the customers' apparent disregard for the value of Internet time, there was evidence which casts doubt upon the defendants' claim that they intended to be legitimate, full-service Internet, faxing, copying, and word-processing vendors. For example, the manager of the Nederland testified that Davis said that he was "not worried about" the roughly $400 every two months in revenue from services other than Internet time and simply told the manager

---

[8] We similarly reject Davis's argument that the district court erred by giving an instruction on "consideration" that was too broad. Davis asked for an instruction stating that: "Consideration means the payment of money for a chance to win a prize." Restricting consideration only to money conflicts with *Jester*'s broader conception of consideration; therefore, the district court did not abuse its discretion by rejecting Davis's proffered instruction. *See United States v. Wright*, 634 F.3d 770, 775 (5th Cir. 2011). We also reject Davis's argument that the district court erred in rejecting his proffered instruction on "sweepstakes" because his proffered instruction did not apply to the facts of this case, where the prizes were less than $50,000. *See* Tex. Bus. & Com. Code Ann. §§ 622.051(a), 622.052(a).

to keep it. The defendants' focus on income from the sale of Internet time to the exclusion of income derived from other services offered by the cafés could reasonably raise the inference that the defendants offered the other services merely as an attempt to make it appear that their sale of Internet time was part of a full-service business, instead of a mechanism for legitimizing unlawful activity. Further evidence that the defendants' true purpose for the cafés was to create a place where people would be comfortable staying for a long time, purchasing Internet time and playing the sweepstakes, was the casino-like atmosphere at the cafés, complete with tinted windows and free food and drink. Finally, it is reasonable to infer that Davis's and Clark's purpose for the cafés was to legitimize illegal gambling from the fact that café customers were required to sign a form stating that they were not gambling upon entering at least one of the cafés; legitimate businesses ordinarily do not require such formalities. Reviewing all facts and inferences in the light most favorable to the jury's verdict, we conclude similarly to the *Jester* court that the main purpose and function of Davis's and Clark's Internet cafés was to induce people to play the sweepstakes, and that the Internet time sold by the cafés—albeit at fair market value—was not the primary subject of the transaction, but instead mere subterfuge.[9] We therefore determine a reasonable trier of fact could conclude that consideration was established beyond a reasonable doubt, and affirm

---

[9] Clark argues, as part of his insufficiency challenge, that the Government failed to prove the *mens rea* required in each of his two illegal gambling convictions. In *Long v. State*, 236 S.W.3d 220, 225 (Tex. App.—Tyler 2007, pet. ref'd), the court held that to be guilty under the Texas gambling laws, a defendant must "intentionally or knowingly operate or participate in the earnings of a gambling place." "Proof of a culpable mental state almost invariably depends upon circumstantial evidence." *Id.* There is sufficient circumstantial evidence that Clark intentionally participated in the earnings of the cafés: he was the signatory on the account at Bank of America for the Spring Creek Cattle Company, which held money from the Dolphin and the Nederland, he signed payroll checks for the Double Click, and he signed the lease for the Dolphin's building.

No. 11-40265

Davis's and Clark's convictions for illegal gambling and conspiring to commit illegal gambling.

## B. Mistake-of-Law Defense

The defendants maintained throughout the proceedings below that they were entitled to raise a mistake-of-law affirmative defense. The district court held a hearing on this issue and issued a thorough oral ruling preventing the defendants from raising the defense. "Whether a defendant should have been allowed to present an affirmative defense is a legal issue that we review *de novo*." *United States v. Sariles*, 645 F.3d 315, 317 (5th Cir. 2011).

In general, under both federal and Texas state law, ignorance of the law is not a defense. *See, e.g.*, *Ratzlaf v. United States*, 510 U.S. 135, 149 (1994); Tex. Penal Code Ann. § 8.03(a) ("It is no defense to prosecution that the actor was ignorant of the provisions of any law after the law has taken effect."). Under federal law, a mistake-of-law defense may be allowed only where the crime charged is a specific intent crime. *Cf. United States v. Whaley*, 577 F.3d 254, 262 n.6 (5th Cir. 2009); *see also United States v. Schultz*, 333 F.3d 393, 410–11 (2d Cir. 2003).

As correctly noted by the district court in its oral ruling, 18 U.S.C. § 1955 is not a specific intent crime, *see United States v. Hawes*, 529 F.2d 472, 481 (5th Cir. 1976), nor do the underlying Texas gambling laws require specific intent, *see Legere v. State*, 82 S.W.3d 105, 109 (Tex. App.—San Antonio 2002, pet. ref'd). As for the conspiracy charge, "[t]he government must prove the same degree of criminal intent as is necessary for proof of the underlying substantive offense." *United States v. Dadi*, 235 F.3d 945, 950 (5th Cir. 2000). Because neither 18 U.S.C. § 1955 nor the relevant Texas gambling laws require specific intent, the conspiracy charged here also does not require specific intent. Consequently, a federal mistake-of-law defense is unavailable to the defendants.

No. 11-40265

Davis and Clark argue that in this sort of "hybrid" prosecution, where federal law borrows state substantive law, defendants should be able to raise a mistake-of-law defense that is rooted in state law. Texas allows an affirmative defense where:

> the actor reasonably believed the conduct charged did not constitute a crime and that he acted in reasonable reliance upon:
>
> > (1) an official statement of the law contained in a written order or grant of permission by an administrative agency charged by law with responsibility for interpreting the law in question; or
> >
> > (2) a written interpretation of the law contained in an opinion of a court of record or made by a public official charged by law with responsibility for interpreting the law in question.

Tex. Penal Code Ann. § 8.03(b)(1)–(2). The Government argues that this defense should not be available to the defendants, who were prosecuted for violating federal law, not state law. Even assuming that the defendants were entitled to present their Texas state-law mistake-of-law defense, we find that the district court was correct to reject it.[10]

Davis claims to have reasonably relied upon a variety of "official statements of the law" and "written interpretations of the law." Clark claims to have relied upon a single judicial opinion. First, Davis claims to have read "five or six" Texas Attorney General ("AG") opinions, and to have relied upon three.[11] We agree with the district court that Davis's reliance on those AG opinions was not reasonable because, as noted by the district court, he ignored more recent

---

[10] In a somewhat analogous case, we rejected defendants' argument that they may raise in a federal prosecution an affirmative defense rooted in state law. *See Sariles*, 645 F.3d 315, 318 n.2 ("[E]ntrapment by estoppel requires a defendant charged with a federal crime to show the actual authority of a government official to render the advice about federal law."); *see also United States v. Ormsby*, 252 F.3d 844, 851 (6th Cir. 2001) (holding that a defendant in a § 1955 case cannot rely on official statements by state officials in pressing an "entrapment by estoppel" defense because state officials have no authority to interpret federal law).

[11] There is no record of which opinions he read and did not rely upon.

17

and more factually analogous opinions that would support a conclusion that his conduct was illegal.  Next, Davis claims that he relied upon three cases: *G2, Inc. v. Midwest Gaming, Inc.*, 485 F. Supp. 2d 757 (W.D. Tex. 2007); *Brice*; and *In re $1,189.51 U.S. Currency*, No. 2009-01-160A (107th Dist. Ct., Cameron County, Tex. Apr 24, 2009).  The Texas mistake-of-law defense "was not created to allow a criminal defendant to rely upon old interpretive opinions, opinions that conflict with others, or on overruled opinions." *Green v. State*, 829 S.W.2d 222, 223 (Tex. Crim. App. 1992) (en banc) (internal quotation marks omitted).  Davis's reliance on *G2* was not reasonable because its discussion of the gambling statutes followed immediately after the court had determined that it lacked jurisdiction. *G2*, 485 F. Supp. 2d at 766.  Clark only claims to have relied upon *G2*; for the same reason as for Davis, Clark's reliance on *G2* was not reasonable.  Davis's reliance on *Brice* was not reasonable because the language in it that is most helpful to Davis conflicts with language in *Jester*—a much more recent decision. Finally, Davis's reliance on *In re $1,189.51* was not reasonable because the court there did not actually rule on the scheme's illegality, as the parties had stipulated to its illegality for the purpose of civil forfeiture.

We further agree with the district court that Davis's claimed reliance on the texts of the Texas Sweepstakes Act, Tex. Bus. & Com. Code Ann. § 622.001 *et seq*., and the Texas Gambling Act, Tex. Penal Code Ann. § 47.01 *et seq*., was not reasonable because the texts of statutes are not "an official statement of the law . . . by an administrative agency charged with responsibility for interpreting the law" or "a written interpretation of the law" as required by § 8.03(b).  Lastly, we agree with the district court that Davis's claimed reliance on a letter opinion by the Texas Alcoholic Beverage Commission regarding a different sweepstakes was not reasonable because it was not factually analogous to the facts here.

We therefore conclude that the district court did not err in preventing Davis and Clark from putting on a mistake-of-law defense because they did not

*reasonably* rely on any "official statements" or "written interpretations" as required by § 8.03(b).

## VI.  CONCLUSION

For the foregoing reasons, we affirm Davis's and Clark's convictions for illegal gambling and conspiracy to commit illegal gambling; reverse Davis's and Clark's convictions for money laundering; and remand to the district court for resentencing and a forfeiture redetermination.

AFFIRMED in part; REVERSED in part; and REMANDED.