

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

## NUMBER 13-14-00283-CR

**THE STATE OF TEXAS,**                                                           **Appellant,**

**v.**

**CHRISTOPHER SHAWN FELLOWS,**                                         **Appellee.**

## NUMBER 13-14-00284-CR

**THE STATE OF TEXAS,**                                                           **Appellant,**

**v.**

**STEVE MARSTON,**                                                                   **Appellee.**

## NUMBER 13-14-00285-CR

**THE STATE OF TEXAS,**                                                           **Appellant,**

**v.**

**PAUL CARTER,**                                                                       **Appellee.**

**On appeal from the 377th District Court
of Victoria County, Texas.**

# OPINION

**Before Chief Justice Valdez and Justices Rodriguez and Garza
Opinion by Justice Rodriguez**

This Court issued a memorandum opinion on June 18, 2015, reversing and remanding the cases for further proceedings. Thereafter, appellees Christopher Shawn Fellows, Steve Marston, and Paul Carter filed motions to publish. We grant the appellees' motions to publish. We withdraw our memorandum opinion and judgments of June 18, 2015, and we substitute the following opinion and judgments in their place.

This case arises from a criminal conspiracy and money-laundering prosecution related to the operation of an alleged illegal gambling establishment in Victoria County, Texas. By one issue, appellant the State of Texas[1] challenges the trial court's granting of the motion to dismiss the indictments against appellees because a computer hard drive that was seized by the police in the raid of the establishment was damaged beyond repair while in the State's custody.[2] We reverse and remand.

## I. Background

On February 18, 2009, officers from the Victoria Police Department and United

---

[1] In this case, the State is represented by prosecutors from the Office of the Attorney General.

[2] Although brought under separate appellate cause numbers, the State's arguments against each appellant are identical. Moreover, appellees filed a single motion to dismiss, and the trial court granted it as to each appellee in one order. As such, we consolidate the appeals and address the State's issue in this single opinion.

States Secret Service raided the Victoria Internet Café (the Café) pursuant to a warrant issued after a nine-month undercover investigation. According to testimony by officers involved in the investigation, the Café offered its customers access to illegal eight-liner gambling devices. During the raid, law enforcement seized every computer in the Café, including the customer terminals and the point-of-sale terminal, referred to by the parties as "POS1," that was used by Café employees to transact with patrons. It is undisputed that the hard drive in POS1 was damaged beyond repair while in the State's custody. The State concedes that no usable information can be retrieved from that hard drive.[3]

In January 2011, in connection with their involvement with the Café, appellees were charged in identical indictments for the offenses of organized criminal activity and money laundering. Count 1 of the indictments alleged that appellees, "with intent to establish, maintain, and participate in a combination and in the profits of a combination, . . . commit[ted] the offense[s] of [Gambling Promotion, Keeping a Gambling Place, Possession of a Gambling Device, and Possession of Gambling Paraphernalia]." *See* TEX. PENAL CODE ANN. § 71.02(a)(2) (West, Westlaw through 2015 R.S.). Count 2 alleged that appellees "knowingly acquire[d], maintain[ed] an interest in, conceal[ed], possess[ed], transfer[red] and transport[ed] . . . [;] conduct[ed], supervise[d] or facilitate[d] a transaction involving . . . [;] and invest[ed], expend[ed] or receive[d] . . . the proceeds of criminal activity." *See id.* § 34.02(a) (West, Westlaw through 2015 R.S.).

In December 2013, appellees filed a motion to dismiss their indictments on the

---

[3] In several proceedings after the indictments against appellees were eventually filed in 2011, the State represented to the trial court that its technical experts were attempting to retrieve data from the damaged hard drive, but eventually conceded that no usable data could be salvaged.

ground that the State's failure to preserve the data from POS1 deprived them of material, exculpatory evidence.[4] Appellees argued that this was a violation of both their due process rights under the United States Constitution and their due course of law rights under the Texas Constitution.[5] *See* U.S. CONST. amend. XIV; TEX. CONST. art. I, § 19. In support, appellees attached several exhibits, including: (1) orders from Cameron County and Hill County cases in which the courts dismissed charges based on devices like those seized from the Café and concluded that they were not illegal gambling devices; (2) manuals for the Hest Sweepstakes System, the program allegedly housed on POS1 that the Café ran on its terminals; (3) a letter from general counsel of the Texas Alcoholic and Beverage Commission expressing his opinion, in a different case, that the Hest Sweepstakes System was not an illegal gambling program; (4) the affidavit of Nick Farley, an electrical engineer who specializes "in the testing and evaluation of gaming and electronic devices," including a report by Farley about the workings of the Hest Sweepstakes System; and (5) the affidavit of Vanessa Pena, a Café employee.

In his affidavit, Farley stated that the Hest sweepstakes program's database stored all current and historical information related to every customer, transaction, and

---

[4] Appellees also filed a motion to quash on both the lost evidence ground and on the ground that the indictments failed to sufficiently specify the facts. The trial court ultimately determined that a motion to quash was not the proper vehicle for appellees' complaints. The motion to quash is not before us in this appeal.

[5] The Due Course of Law Clause provides no greater protection than the Due Process Clause regarding the State's loss or destruction of evidence in a criminal prosecution. *See State v. Vasquez*, 230 S.W.3d 744, 750–51 (Tex. App.—Houston [14th Dist.] 2007, no pet.); *McGee v. State*, 210 S.W.3d 702, 705 (Tex. App.—Eastland 2006, no pet.); *Salazar v. State*, 185 S.W.3d 90, 92 (Tex. App.—San Antonio 2005, no pet.); *Jackson v. State*, 50 S.W.3d 579, 588–89 (Tex. App.—Fort Worth 2001, pet. ref'd); *Mahaffey v. State*, 937 S.W.2d 51, 53 (Tex. App.—Houston [1st Dist.] 1996, no pet.); *State v. Rudd*, 871 S.W.2d 530, 532–33 (Tex. App.—Dallas 1994, no pet.); *Saldana v. State*, 783 S.W.2d 22, 23 (Tex. App.—Austin 1990, no pet.).

4

"sweepstakes reveal." Farley stated that the

> information that was maintained in the database would have been exculpatory in defending against [the State's] allegations if, for example, the [State's] contention is that there were no entries available without purchase but the Cafe did in fact provide entries without purchase upon request; or that the customers did not know the sweepstakes prizes were not determined by the game terminals if, in fact, customers redeemed the sweepstakes prizes at the point of sale register or redeemed the sweepstakes prize at the game terminals without playing the games.

Farley stated that "[i]t is commonly understood throughout the gaming industry, including regulators, that one of the reasons for maintaining a database of this nature is to guard against allegations such as the ones in this case as well as providing a mechanism by which regulatory or law enforcement agencies can monitor the establishment." Finally, in the report about the workings of the Hest system attached to Farley's affidavit, Farley concluded that the Hest sweepstakes program was not a "traditional gaming device" in that its "outcome is based upon a finite pool of sweepstakes entries" and "pre-determined" prizes.

Citing the various exhibits and Pena and Farley's affidavits, appellees contended that the lost evidence from POS1 would have shown that the sweepstakes program complied with Texas law and was not an illegal gambling device. *See* TEX. PENAL CODE ANN. § 47.01(4) (West, Westlaw through 2015 R.S.) (defining as a "gambling device" "any electronic, electromechanical, or mechanical contrivance . . . that for a consideration affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the contrivance"). Appellees contended that Café patrons were given entries to the sweepstakes after they bought long-distance

5

phone cards. Appellees contended that patrons were able to reveal their sweepstakes prizes without playing the games, that patrons were not required to buy phone cards to participate in the sweepstakes, and that patrons bought phone cards without participating in the sweepstakes. In sum, appellees argued that the destroyed evidence would have shown that: the program was not an illegal game of chance because the prizes for the game were set and patrons merely "revealed" the prizes after playing the game; there was no consideration involved because patrons could play the game for free; and there was no illegal prize because Texas law allows for cash prizes in sweepstakes.

The State responded that the lost evidence from the database was not material, exculpatory evidence under *Brady v. Maryland* but, instead, potentially useful evidence under a later line of cases starting with *Arizona v. Youngblood*. Under those cases, the State argued, appellees would be required to show that law enforcement acted in bad faith in failing to preserve the evidence.

After a hearing, the trial court granted appellees' motion to dismiss. In its dismissal order, the trial court made the following relevant findings of fact:

1.  On or about February 18, 2009, the State of Texas raided the Victoria Internet Café located at 2604 N. Laurent, Victoria, Victoria County, Texas.

2.  On or about February 18, 2009, the State of Texas seized and took control of the Victoria Internet Cafe computer system.

3.  On or about February 18, 2009, at the time the Victoria Internet Cafe computer system was seized by the State of Texas, the Victoria Internet Cafe computer system was operational for [sic] the State of Texas charged those seated at computers with criminal offenses.

4.  The Victoria Internet Cafe computer system has been under the care, custody and/or control of the State of Texas or its agents since its seizure on or about February 18, 2009.

6

5.   One of the items seized by the State of Texas, or its agents, on February 18, 2009 was a Point of Sale computer commonly referred to as POS 1.

6.   It is undisputed that on or about February 18, 2009, at the time of the raid of the Victoria Internet Cafe, the Victoria Internet Cafe computer system was operating software developed by Hest Technologies known as Hest Sweepstakes Management System.

7.   The Victoria Internet Cafe was operating the Hest Get Connected Sweepstakes Management System as evidenced by the Get Connected cards seized by the State at the time of the raid on or about February 18, 2009. . . .

8.   Whether the Victoria Internet Cafe was operating the Hest Get Connected Sweepstakes Management System or the Hest Prepaid Planet Sweepstakes Management System is not an issue in the present matter as Nick Farley testified by way of affidavit that regardless of the system used "the manner and means in which the System generated and stored internal data, commonly referred to as the database, did not change."

9.   The Hest Sweepstakes System database stored all current and historical information relating to each and every customer, all current and historical information relating to each and every sale and all current and historical information relating to each and every sweepstake reveal or play.

10.  The Hest Sweepstakes System database . . . and/or internal programs using data contained within the database, would allow Defendants to review the entire history of each and every transaction related to each and every customer's individual account.  This information included all items purchased, including phone cards, internet time and phone accessories, including the date and amount of each purchase.  This information included any sweepstakes entries revealed regardless of the method in which the sweepstakes entries were revealed, such as at the POS, at a computer terminal without playing the games or at the computer terminal through entertaining games.  If the customer revealed prizes via the entertaining games the database housed the historical information of the games played, the times each game was played, and the sweepstakes prizes revealed with each game.  This database also maintained information as to each account number showing sweepstakes entries associated with each participant's account.

7

This included prizes that had not been redeemed. All sweepstakes entries, whether obtained with a purchase or obtained through no purchase, are maintained by the database, which housed information as to whom entries were issued, the date they were issued and the sweepstakes prize, if any, awarded as a result of each free sweepstakes entry. This information was stored by individual customer account number, but could be accessed through various reports generated by software contained within the system.

11.   One of the reasons for maintaining a database of this nature is to guard against allegations of the nature charged in the present indictment.

12.   At the time of the raid of the Victoria Internet Cafe on or about February 18, 2009, the State of Texas realized the importance of the information stored on the Victoria Internet Cafe computer system for the State of Texas had the United States Secret Service participate in the raid and the dismantling of the Victoria Internet Café computer system.

13.   Defendants offered the testimony of Nick Farley and Vanessa Pena by affidavit. The State did not object to the testimony of either witness in this fashion.

14.   Ms. Vanessa Pena testified by way of affidavit. Ms. Pena was employed for approximately one year at the Victoria Internet Cafe as a sales assistant and operated a Point of Sale Register. Ms. Pena [] testified [that she regularly provided customers free sweepstakes entries; regularly redeemed entries for customers at the POS1 terminal; regularly observed customers redeeming entries using the "quick redeem" feature; and regularly sold phone cards to customers who did not redeem sweepstakes entries] . . . .

15.   Nick Farley testified by way of affidavit that this information would be stored within the database and that this information, in a case of this nature, was both material and exculpatory.

16.   The Victoria Internet Cafe Hest System database contained evidence that was both material and exculpatory to the defendants in the matter.

17.   The Court finds that the State failed to preserve material and exculpatory evidence.

18. The defendants bear no fault in the destruction of the exculpatory evidence.

. . . .

20. This evidence goes directly to the elements of the charges contained in the present indictment.

The trial court then drew the following conclusions of law:

1. The state's failure to preserve material and exculpatory evidence is a Due Course of Law violation. Tex. Const. Art. I. Sec. 19;

2. The state's failure to preserve material and exculpatory evidence is a violation of the Defendant's right to Due Process. U.S. Const. Amendment XIV, § 1;

3. A motion to . . . dismiss an indictment is proper when law enforcement fails to preserve evidence that is both material and exculpatory. *Mahaffey v. State*, 937 S.W.2d 51 (Tex.[]App.—Houston [1st Dist.] 1996, no pet.) . . . [;]

4. A due course of law and a due process violation occurs whenever a state suppresses or fails to disclose material, exculpatory evidence, regardless of whether or not the state acted in bad faith. *Illinois v. Fisher*, 540 US 544, 547–48 . . . (2004);

5. Because material and exculpatory evidence was located on the computer and said evidence was lost by the State, proceeding to trial will result in a deprivation of the Defendant's constitutional right to Due Course of Law and Due Process of Law . . . .

This appeal followed.

## II. Standard of Review

In reviewing the dismissal of an indictment, the appellate court must review the trial court's ruling under a bifurcated standard. The court of appeals must give almost total deference to a trial court's findings of facts that are supported by the record, as well as mixed questions of law and fact that rely upon the credibility of a witness. However, the court of appeals applies a de novo standard of review to pure questions of law and mixed questions that do not depend on credibility determinations.

*State v. Krizan-Wilson*, 354 S.W.3d 808, 815 (Tex. Crim. App. 2011) (citing *State v. Moff*,

154 S.W.3d 599, 601 (Tex. Crim. App. 2004); *Guzman v. State*, 955 S.W.2d 85, 87–89 (Tex. Crim. App. 1997)).

### III.   Discussion

By one issue, the State argues that the trial court erroneously employed the legal standard from *Brady v. Maryland* to dismiss the indictments, reasoning that *Brady*'s "material and exculpatory" standard cannot be applied before a trial on the merits.   *See* 373 U.S. 83, 87 (1963).   The State suggests that where evidence is lost before trial, it can only be considered "potentially useful" as "no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant."   *See Arizona v. Youngblood*, 488 U.S. 51, 57–58 (1988).   Because the lost evidence in this case was merely "potentially useful" and appellees failed to make the requisite showing that the State and law enforcement acted in bad faith, the State argues that the trial court had no legal basis to dismiss the indictments.   In response, appellees argue that "[t]here is no doubt that the Victoria Café Hest Sweepstakes System [i.e., POS1], at the time of seizure by the State[,] contained exculpatory and material information."

### A.   Applicable Law

"A prosecutor has an affirmative duty to turn over material, favorable evidence to the defense.   Additionally, the government is constitutionally required to preserve evidence that might be expected to play a significant role in the suspect's defense." *Little v. State*, 991 S.W.2d 864, 866 (Tex. Crim. App. 1999).   "So the Supreme Court's jurisprudence divides cases involving nondisclosure of evidence into two areas[.]   [First], *Brady* addresses exculpatory evidence still in the government's possession."   *Id.* (citing *Brady*, 373 U.S. at 87).   Under *Brady*, the suppressed or undisclosed evidence must be

10

both exculpatory and material. 373 U.S. at 87. "[E]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985). In an earlier case, the Supreme Court noted that *Brady* and its material/exculpatory framework generally applies to "situations . . . involv[ing] the discovery, after trial[,] of information which had been known to the prosecution but unknown to the defense." *United States v. Agurs*, 427 U.S. 97, 103 (1976). *Bagley*'s definition of materiality is therefore consistent because "[u]sually, a determination concerning the materiality prong of *Brady* involves balancing the strength of the exculpatory evidence against the evidence supporting conviction." *Hampton v. State*, 86 S.W.3d 603, 613 (Tex. Crim. App. 2002).

The second area of nondisclosure is governed by *Youngblood* and *California v. Trombetta*, cases where "the government no longer possesses the disputed evidence." *Little,* 991 S.W.2d at 866 (citing *Youngblood*, 488 U.S. at 57–58; *Trombetta*, 467 U.S. 479, 488–89 (1984)). In *Youngblood*, the Supreme Court reasoned and held as follows:

> The Due Process Clause of the Fourteenth Amendment, as interpreted in *Brady*, makes the good or bad faith of the State irrelevant when the State fails to disclose to the defendant material exculpatory evidence. But we think the Due Process Clause requires a different result when we deal with the failure of the State to preserve evidentiary material of which no more can be said than that it could have been subjected to tests, the results of which might have exonerated the defendant. Part of the reason for the difference in treatment is found in the observation made by the Court in *Trombetta*, . . . that "[w]henever potentially exculpatory evidence is permanently lost, courts face the treacherous task of divining the import of materials whose contents are unknown and, very often, disputed." [And] [p]art of it stems from our unwillingness to read the "fundamental fairness" requirement of the Due Process Clause . . . as imposing on the police an undifferentiated and absolute duty to retain and to preserve all material that might be of conceivable evidentiary significance

in a particular prosecution. We think that requiring a defendant to show bad faith on the part of the police both limits the extent of the police's obligation to preserve evidence to reasonable bounds and confines it to that class of cases where the interests of justice most clearly require it, *i.e.*, those cases in which the police themselves by their conduct indicate that the evidence could form a basis for exonerating the defendant. We therefore hold that unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law.

488 U.S. at 57–58 (quoting *Trombetta*, 467 U.S. at 486) (other citations omitted); *see Illinois v. Fisher*, 540 U.S. 544, 547 (2004) (citations omitted).

To summarize the forgoing authority, if the State fails to preserve evidence that is exculpatory and material, then a due process violation has occurred regardless of the good or bad faith on the part of the State in failing to preserve that evidence. *See Fisher*, 540 U.S. at 547; *Youngblood*, 488 U.S. at 57–58; *see also Martinez v. State*, No. 13-06-665-CR, 2008 WL 2515876, at *7 (Tex. App.—Corpus Christi Jan. 24, 2008) (mem. op., not designated for publication). However, if the State fails to preserve potentially useful evidence, the defendant must go a step further and demonstrate that the State failed to preserve that evidence in bad faith. *See Fisher*, 540 U.S. at 547; *Youngblood*, 488 U.S. at 57–58; *see also Martinez*, 2008 WL 2515876, at *7.

## B.  Material and Exculpatory or Potentially Useful Information

Because the trial court in this case did not make a finding of bad faith, we must determine whether there exists a legal basis to conclude that the information on POS1 was material and exculpatory, rather than merely potentially useful. *See Krizan-Wilson*, 354 S.W.3d at 815. Appellees attempted to establish the content of the information on POS1 primarily through the affidavits of Farley and Pena, which the trial court discussed in its findings of fact.

12

### 1.    Appellees' Supporting Affidavits

Farley stated in general terms that POS1 would contain transaction history for each and every customer account, including the store items purchased and the manner in which sweepstakes prizes were revealed—i.e., whether the prize was revealed at the POS1, at a computer terminal without playing the games, or at the computer terminal by playing the entertaining games.   Although Farley identified the type of information that POS1 was capable of storing, he had no personal knowledge of its actual content.   Thus, Farley could only say that POS1 potentially stored useful information, depending on what was inside.   *See Youngblood*, 488 U.S. at 57 (holding that a semen sample found on the sexual assault victim's clothes—which had not been tested prior to its destruction—was only potentially useful in a sexual assault case because it might have exonerated the defendant, but there was no way to know the result of any testing).

Although Farley's affidavit was speculative, at best, concerning the actual information on POS1, appellees also introduced Pena's affidavit, which drew no objection from the State.   In her affidavit, Pena, a former employee of the Café, stated that:   (1) she regularly provided patrons free entries into the sweepstakes ("free entries"); (2) she regularly assisted patrons who redeemed sweepstakes without playing the entertaining games ("quick reveal"); and (3) she regularly assisted patrons who purchased phone cards but did not redeem their sweepstakes entries ("no-reveal").   Farley stated in his affidavit that these facts would have been documented on POS1.[6]

---

[6] Farley then hypothesized that the information on POS1 would be exculpatory if the State's "contention[s] [were] that there were no [free entries available] . . . or that the customers did not know the sweepstakes prizes were not determined by the game terminals."   It is worthy of note that the State never contended that no free entries were available.   Instead, the State conceded the fact of free entries, but argued that the consideration element was not negated by that fact alone.

Deferring to the trial court's fact findings, we must accept that the information on POS1 would have shown what Pena said it would have shown—i.e., evidence of some free entries, some quick reveals, and some no-reveals. *See Krizan-Wilson*, 354 S.W.3d at 815. Consequently, the question becomes whether this information is exculpatory and material in a prosecution for organized crime in which gambling offenses supply the underlying criminal activity.

## 2.     The State's Indictment

As previously mentioned, the State's indictment alleged that appellees, "with intent to establish, maintain, and participate in a combination and in the profits of a combination, . . . commit[ted] the offense[s] of [gambling promotion, keeping a gambling place, possession of a gambling device, and possession of gambling paraphernalia]." *See* TEX. PENAL CODE ANN. § 71.02(a)(2). Each gambling offense alleged in the indictment required the State to prove either that a gambling device or a lottery was involved.[7]     *See* TEX. PENAL CODE ANN. § 47.03(a)(1), (5) (West, Westlaw through 2015 R.S.) (promoting

---

[7] A person is guilty of "gambling promotion" if the State proves that he intentionally or knowingly "operates or participates in the earnings of a gambling place" or "for gain, sets up or promotes any *lottery* or sells or offers to sell or knowingly possesses for transfer, or transfers any card, stub, ticket, check, or other device designed to serve as evidence of participation in any *lottery*." *See* TEX. PENAL CODE ANN. § 47.03(a)(1), (5) (West, Westlaw through 2015 R.S.) (emphasis added). A person is guilty of "keeping a gambling place" if the State proves that he "uses or permits another to use as a gambling place any real estate, building, room, tent, vehicle, boat, or other property whatsoever owned by him or under his control, or rents or lets any such property with a view or expectation that it be so used." *Id.* § 47.04(a). A "gambling place" is "any real estate, building, room, tent, vehicle, boat, or other property whatsoever, one of the uses of which is ... the conducting of a *lottery* or the playing of *gambling devices*." *Id.* § 47.01(3) (emphasis added). A person is guilty of "possession of a gambling device" if, "with the intent to further gambling, he knowingly owns, manufactures, transfers, or possesses any *gambling device* that he knows is designed for gambling purposes or any equipment that he knows is designed as a subassembly or essential part of a *gambling device*." *Id.* § 47.06(a) (emphasis added). A person is guilty of "possession of gambling paraphernalia" if, "with the intent to further gambling, the person knowingly owns, manufactures, transfers commercially, or possesses gambling paraphernalia." *Id.* § 47.06(c). "Gambling paraphernalia" means any record, ticket, certificate, bill, slip, token, writing, scratch sheet, or other means of carrying on a lottery. *Id.* § 47.01(6).

14

gambling); *Id.* § 47.04(a) (keeping a gambling place); *Id.* § 47.06(a) (possessing a gambling device); *Id.* § 47.06(c) (possession gambling paraphernalia).  A "gambling device" is "any electronic, electromechanical, or mechanical contrivance . . . that *for a consideration* affords the player an opportunity to obtain anything of value, the award of which is determined solely or partially by chance, even though accompanied by some skill, whether or not the prize is automatically paid by the contrivance."  *Id.* § 47.01(4) (emphasis added).  A "lottery" is "any scheme or procedure whereby one or more prizes are distributed by chance among persons who have paid or promised *consideration* for a chance to win anything of value. . . ."  *Id.* § 47.01(7) (emphasis added); *United States v. Davis*, 690 F.3d 330, 333 (5th Cir. 2012) (citing *Brice v. State*, 242 S.W.2d 433, 434 (Tex. Crim. App. 1951)).  A gambling device and a lottery must contain the essential element of consideration.

After reviewing the indictment, the trial court's findings, and the arguments of the parties, we find it evident that the dispute concerning the exculpatory value and materiality of the information on POS1 centers on a disagreement about the meaning of the consideration element as it relates to the legality of promotional sweepstakes under these Texas gambling statutes.  In order to resolve this dispute, we must evaluate the extent to which the information on POS1 would have negated the element of consideration.

### 3.  The Challenged, Consideration Element

Several courts have examined whether the element of consideration was present in sweepstakes schemes that were substantially similar to the one at issue here.  We draw on these cases for guidance in resolving the ultimate issue.  In *Jester v. State*, the Texarkana Court of Appeals considered the sufficiency of the evidence to convict an

15

owner who offered a sweepstakes played on electronic devices at his store. 64 S.W.3d 553, 554 (Tex. App.—Texarkana 2001, no pet.). Similar to the sweepstakes scheme at issue here, the sweepstakes in *Jester* offered participants the opportunity to receive plays without any purchase necessary—i.e., free entries. *Id.* at 555. Participants also could receive entries through the purchase of a phone card, which gave the participants 100 credits to play the sweepstakes. *Id.* In analyzing whether consideration was present in the *Jester* sweepstakes, the court of appeals held that "the decision turn[ed] on whether the sweepstakes was intended to promote the sale of telephone cards or whether the telephone cards were there as an attempt to legitimize an illegal gambling device." *Id.* at 558. Applying this framework, the court of appeals concluded that the sweepstakes satisfied the consideration element and determined that the sale of phone cards was an attempt to legitimize illegal gambling. *Id.* The following evidence drove its decision:

> telephone cards cost "much" more per minute than the market cost of telephone time; there was testimony that the telephone cards did not work; there was evidence that players did not value the telephone cards, and that some players did not know they even were telephone cards; there was testimony that the employees were aware that the customers did not value the telephone cards; there were no signs on the outside of the building advertising or indicating that telephone cards were sold at the store; and no employee tried to sell customers on the telephone cards.

*United States v. Davis*, 690 F.3d 330, 338 (5th Cir. 2012) (summarizing the evidence driving the *Jester* Court's finding that the consideration element was satisfied).

In *Davis*, the Fifth Circuit, citing *Jester*, found the evidence sufficient to support the consideration element under a sweepstakes scheme similar to the one at issue here:

> There were three ways for sweepstakes participants to acquire entries. First, by purchasing Internet time at one of the cafés; each dollar of Internet time purchased came with 100 entries. Second, by requesting entries in person at the café, up to 100 entries a day. Or third, by requesting entries

16

by mail, also up to 100 entries a day. After obtaining entries, participants could choose among three ways to find out if their entries were winners; the method chosen did not affect whether a particular entry was a winner or a loser because, as noted earlier, whether it was a winner or a loser was predetermined by the computer software. First, participants could ask the clerk who sold them Internet time to instantly reveal whether any of their entries were winners and if so, what their total winnings were. Second, participants could swipe at a computer terminal the card issued by the cafés that electronically stored Internet time and entries, and then choose "reveal" or "quick win" on the screen. That option would, like the instant reveal, immediately tell the participant whether or not the entries were winners, and if so, for how much.

Third, participants could reveal whether their entries were winners by playing a variety of casino-like games available on each computer terminal.

*Davis*, 690 F.3d at 333. The Fifth Circuit applied *Jester's* purpose-and-function approach to determine whether the consideration element was satisfied and concluded: "the main purpose and function of [the café] was to induce people to play the sweepstakes, and . . . the Internet time sold by the cafés . . . was not the primary subject of the transaction, but instead mere subterfuge" to legitimize illegal gambling. *Id.* at 339–40. The *Davis* Court recited the following evidence as indicia that consideration fueled the sweepstakes:

Customers' receipts indicating over 300,000 minutes of Internet time remaining were evidence that the customers did not value the Internet time they had purchased. Further evidence that customers did not value their Internet time was the investigating police officers' uniform testimony that during each of their visits to a café, all of the people there were only engaged in playing the sweepstakes—not accessing the Internet or using any of the other services provided. In addition to the customers' apparent disregard for the value of Internet time, there was evidence which casts doubt upon the defendants' claim that they intended to be legitimate, full-service Internet, faxing, copying, and word-processing vendors. For example, the manager of [the café] testified that Davis said that he was "not worried about" the roughly $400 every two months in revenue from services other than Internet time and simply told the manager to keep it. The defendants' focus on income from the sale of Internet time to the exclusion of income derived from other services offered by the café[] could reasonably raise the inference that the defendants offered the other services merely as an attempt to make it appear that their sale of Internet time was part of a

17

full-service business, instead of a mechanism for legitimizing unlawful activity. Further evidence that the defendants' true purpose for the café[] was to create a place where people would be comfortable staying for a long time, purchasing Internet time and playing the sweepstakes, was the casino-like atmosphere at the cafés, complete with tinted windows and free food and drink. Finally, it is reasonable to infer that [the defendants'] purpose for the cafés was to legitimize illegal gambling from the fact that café customers were required to sign a form stating that they were not gambling upon entering at least one of the café[]; legitimate businesses ordinarily do not require such formalities.

*Id.*

Most recently, in *Texas v. Ysleta del sur Pueblo*, the United States District Court for the Western District of Texas surveyed the case law on the issue of promotional sweepstakes and the element of consideration. No. EP-99-CV-320-KC, 2015 WL 1003879, at *30 (W.D. Tex. Mar. 6, 2015). The court, relying heavily on *Jester* and *Davis*, made the following observations: (1) "a sweepstakes will not necessarily constitute an illegal lottery when a means of entry is connected to the purchase of a legitimate product"; (2) "a promotional sweepstakes must also offer an alternative means of free entry"; (3) however, "[t]he mere pretense of free prizes, designed to evade the law, [will] not negate the element of consideration"; and (4) "the primary subject of the transaction must be the promoted product and not the sweepstakes game itself." *Id.* at *30 (citations and internal quotes omitted).

We agree with these courts that the question of whether consideration is present in any promotional sweepstakes should turn on whether the product promoted was mere subterfuge to promote play in the sweepstakes or whether the sweepstakes promoted a legitimate product. Under this test, the availability of free entries is necessary, but not

18

sufficient, to remove consideration from the sweepstakes.[8]   Indeed, the *Davis* and *Jester*

Courts found consideration even in the face of undisputed evidence that free entries were

available.   *Davis*, 690 F.3d at 339–40; *Jester*, 64 S.W.3d at 558.   Thus, the existence of

free entries alone does not negate consideration, but must be taken in conjunction with

all of the facts and evidence.

Deferring to the trial court's fact findings, the most that can be said about POS1

is—as per Pena's affidavit—that it stored evidence that some sweepstakes entries were

free, some customers did not use the entertaining games to redeem sweepstakes entries,

and some customers bought store products without redeeming their sweepstakes entries.

In view of the standard by which the consideration element is to be assessed by the jury,

we cannot conclude that this evidence would be exculpatory and material, rather than

merely potentially useful.   *See Davis*, 690 F.3d at 339–40; *Ysleta del sur Pueblo*, 2015

WL 1003879, at *30; *Jester*, 64 S.W.3d at 558; *see also Fisher*, 540 U.S. at 547;

*Youngblood*, 488 U.S. at 57–58.

### 4.  Reasonable Availability of Comparable Evidence

Furthermore, in order to meet the materiality prong of the due process test, the

information on POS1 had to be "of such a nature that the [appellees] would be unable to

obtain comparable evidence by other reasonably available means."   *See Trombetta*, 467

U.S. at 489 (articulating the standard for constitutional materiality in a lost-evidence

---

[8] We observe that the information on POS1 might have been exculpatory and material had appellees presented evidence that the *only* means of entry into the sweepstakes was by way of free entry. However, Pena could only say that free entries were "regularly" provided.   There is no dispute that an alternative means of entry into the sweepstakes was through purchase of a store product.

case).[9]  In this regard, the State furnished appellees with 115,000 pages of discovery, which, according to the State, included the names and addresses of witnesses who could say whether or not they were given free plays, explanations of how the instant reveal works, and whether or not they revealed all of their sweepstakes entries.  In addition, appellees did not dispute that there was audio of the games being explained by the employees to the officers and pages of sign in sheets for the sweepstakes and for internet time.  The State also provided an accounting for each week of the indicted period that shows the amount of phone time sold, free entries given, other promotions given, internet time sold, and amount of entries redeemed, among other information.

Appellees acknowledge that this evidence was made available to them but assert that it "completely fail[s] to provide the [information on POS1]."  In support of this assertion, appellees argue that the documents "do not provide the necessary detail needed as the records that were available on POS1[.]"  However, appellees fail to explain how the documents lack sufficient detail or are incomparable to the information on POS1.  Additionally, appellees assert that the documents are not an adequate substitute because they would not show that participants who obtained entries through the purchase of phone cards had an equal chance of winning as participants who obtained entries for free.  While equality of chance has been recognized as a factor that is relevant to the consideration element, we note that Pena's affidavit concerning the activity she observed at the café contains no information on the matter.  Furthermore, Farley remains available to testify—consistent with his affidavit—that the chance of winning was the

_____

[9] In this case, the trial court made no determination that comparable information to that found on POS1 was unavailable to appellees.

20

same, whether by way of free entry or by purchase of a product. Finally, according to appellees, the documents were further inadequate because they did not "provide the necessary detail to prove how the software functioned or that appellees were operating a legal sweepstakes." However, again, that information is readily available through Farley, and no showing has been made that the type of information on POS1 would include anything more than customers' transaction history.

## 5. Summary

It was not shown in the trial court that the information on POS1 was exculpatory and material, rather than merely potentially useful. Furthermore, as to materiality, we are not persuaded that appellees lack reasonable access to comparable evidence. Accordingly, we sustain the State's issue. *See id.*

## IV. Conclusion

Having concluded that there was no legal basis for the trial court to grant appellees' motion to dismiss, we reverse its order and remand the cases for further proceedings.

NELDA V. RODRIGUEZ
Justice

Publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
23rd day of July, 2015.